Filed 1/23/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DOROTHY W. GAYNOR et al, | D070907 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. PN16579) |
| JAMES A. BULEN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Julia C. Kelety, Judge. Affirmed.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall, Richard A. Heller and Mary V. Cataldo for Defendant and Appellant.

Witham Mahoney & Abbott, Daniel W. Abbott, Stephen D. Blea; Law Office of James J. Moneer and James J. Moneer for Plaintiffs and Respondents.

Appellant James Bulen (James) and respondents (the Gaynor beneficiaries)[1] are extended family members who are cobeneficiaries of a trust (Trust) created by their

---

1    Respondents are: Dorothy Gaynor, James Wilmot, Michelle Gaynor, and Max Gaynor.

grandfather or great-grandfather (Grandfather). Years after Grandfather's death, these individuals and others engaged in contentious disputes over the management and control of the Trust.

After the probate court resolved these disputes, the Gaynor beneficiaries filed a surcharge petition against the cotrustees, and later added James as a respondent based on his alleged de facto trustee status. The Gaynor beneficiaries alleged a single breach of fiduciary duty cause of action, claiming the cotrustees and James took numerous actions to benefit themselves at the expense of the other beneficiaries. One of those actions involved distributing Trust funds only to themselves and other senior beneficiaries. Another action involved a plan to modify the Trust terms to create new trustee succession rules ensuring the cotrustees' (and James's) continued control over the Trust distributions. The Gaynor beneficiaries alleged that in implementing this latter plan, James and the cotrustees wrongfully withdrew trust assets and then used these assets to file and defend probate petitions in attempting to persuade the probate court to adopt their plan. The Gaynor beneficiaries sought reimbursement of all funds improperly withdrawn from the Trust.

Focusing on the paragraphs of the surcharge petition related to the prior probate litigation, James moved to strike the claims against him under California's anti-SLAPP statute. (Code Civ. Proc., § 425.16 (§ 425.16).) The probate court found the claims were

not governed by the anti-SLAPP statute and denied the motion. James appeals. We affirm.

To trigger anti-SLAPP protection, the moving party has the initial burden to show the plaintiff alleges constitutionally-protected activity *and* the claim arises from this activity. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062-1073 (*Park*).) Although the surcharge petition includes allegations that James engaged in constitutionally-protected activity (his actions in the prior probate litigation), James did not meet his burden to show the claims against him arose from this litigation activity. James's involvement in the prior probate litigation constituted evidence of his alleged breaches of loyalty, i.e. his alleged formulation of a plan to benefit himself to the detriment of the Gaynor beneficiaries and the alleged improper use of trust assets to implement that plan. Without more, a trustee's breach of loyalty, including the use or misuse of trust funds, is not constitutionally protected. Thus, the probate court properly denied James's anti-SLAPP motion without reaching the probability-of-prevailing issue.

FACTUAL AND PROCEDURAL SUMMARY[2]

*Background*

Grandfather died in 1983, leaving three adult children: William, James Sr. (appellant's father), and Mary. Under the Trust provisions, the Trust was divided into

---

2    The Trust litigation has a lengthy history. We summarize only those facts necessary to resolve the anti-SLAPP issues before us, relying on the operative pleading and accepting as true the evidence favorable to the Gaynor beneficiaries. (See *Park*, *supra*, 2 Cal.5th at p. 1067). We use first names to avoid confusion in identifying family members.

3

three shares, one for each of his three children and that child's issue. The Trust's primary asset was the ownership of shopping center property that generated substantial income. Under the Trust terms, the Trust will remain in effect until a specified event, estimated to occur in about 2092.

The Trust named one of Grandfather's sons (William) as successor trustee, with Grandfather's accountant to succeed William, and then San Diego Trust and Savings Bank to succeed the accountant. The Trust provided that any other successor trustee "must be a corporation authorized under [federal or state laws] to administer trusts and have total capital, surplus and undivided profits of not less than $20 million." The Trust gave the trustee the authority to distribute net income among all of the beneficiaries.

In about 1990, after serving as a trustee for several years, William created a plan that deviated from the Trust's trustee-succession provisions (the 1990 plan). This plan proposed a committee of three trustees (one from each branch of the family) to serve as successor trustees of the Trust. One year later, the probate court appointed three trustees under this plan: (1) one of Mary's daughters; (2) one of James Sr.'s daughters (appellant James's sister); and (3) one of William's sons.

During the next 20 years, when one of these cotrustees resigned or died, the remaining trustees successfully filed unopposed petitions with the court to appoint a replacement trustee, maintaining representation from each branch of the family. With minor exceptions, the Trust income was distributed only to the senior class, or generation, of beneficiaries. The successor trustees and James were members of this senior generation.

4

*Shopping Center Property Ownership*

Before 2006, the Trust's shopping center property was co-owned with various individual senior-generation family members. In about 2006, the trustees (with James's alleged advice and assistance) formed a limited liability company (the Shopping Center LLC) to hold title to the shopping center. This action allegedly caused the Trust to lose the " 'control premium' " value associated with management and control of the shopping center property, and allegedly benefited James and other senior beneficiaries to the detriment of other beneficiaries.

*New Proposed Plan for Trustee Appointment and Succession*

In 2011, the Trust's trustees were: (1) Edwin (James Sr.'s son and appellant James's brother); (2) Christopher (William's grandson); and (3) Mary (Grandfather's daughter) (collectively referred to as the Cotrustees). At about this time, the Cotrustees (allegedly with James's advice and assistance) "formulate[d] a self-serving and entirely new method for choosing and installing successor trustees." To implement this plan, the Cotrustees filed a probate petition (Petition to Modify), seeking approval to abandon the 1990 plan, and to instead modify the Trust provisions to: (1) eliminate the requirement that the successor trustee be a corporation; (2) specify that the current Cotrustees had the sole authority to nominate successor trustees without regard to family branch; and (3) allow only those beneficiaries then receiving income (the nine "senior generation"

5

members out of the 46 beneficiaries) to vote for successor trustees.[3]  Under this proposal, the Cotrustees would have the authority to decide the beneficiaries who would have voting authority and thus to control how the distributions would be made.

The Gaynor beneficiaries opposed the Petition to Modify, and in July 2012, a trial was held on the petition.  At the end of the trial, the probate court (Superior Court Judge Richard Cline) ruled in favor of the Gaynor beneficiaries, finding "the circumstances [were] not of a type contemplated by Probate Code section 15409, as grounds for modification of the [T]rust. . . ."

At about the same time, the Gaynor beneficiaries petitioned to remove the Cotrustees and to appoint a successor corporate trustee under the Trust provisions (Petition to Appoint).  The Gaynor beneficiaries proposed two financial institutions that had consented to serve.  The Cotrustees (allegedly with James' advice and assistance) opposed this petition, requesting that the beneficiaries be allowed to " 'elect' " the initial corporate trustee, and proposed a fiduciary entity that was allegedly unqualified and allegedly would favor the senior beneficiaries.  The Gaynor beneficiaries opposed this proposal, arguing it was asserted solely to perpetuate the " 'senior-generation-only' " income distribution policy, which benefited the Cotrustees and James to the detriment of the younger beneficiaries.

---

3    This petition was filed under Probate Code section 15409, subdivision (a), which states: "On petition by a trustee or beneficiary, the court may modify the administrative or dispositive provisions of the trust or terminate the trust if, owing to circumstances not known to the settlor and not anticipated by the settlor, the continuation of the trust under its terms would defeat or substantially impair the accomplishment of the purposes of the trust."

6

The court then asked the Cotrustees to file a petition for instructions to permit the court to rule on these issues. In the responding petition (Petition to Construe), the Cotrustees (allegedly with James's advice and assistance) asked the court to: (1) approve the election of their proposed fiduciary as the successor trustee; (2) waive or eliminate the $20 million minimum net worth requirement for corporate trustees; and (3) provide the trustees with " 'virtually unlimited discretion' " to distribute income. The Gaynor beneficiaries opposed these requests.

After months of hearings and several rounds of briefing, the court issued an order finding it would appoint the successor trustee proposed by the Gaynor beneficiaries. Before the court appointed this corporate trustee, the Gaynor beneficiaries moved for attorney fees incurred in the probate litigation, arguing their efforts created a common fund or benefit for the other Trust beneficiaries by ending the " 'senior-generation-only' " distribution, making Trust funds available to junior generations, and installing a neutral and professional trustee to protect and preserve Trust assets. The Cotrustees opposed the motion. While the attorney fees motion was pending, the Cotrustees (allegedly with James's advice and assistance) spent Trust funds to engage in mediation on the motion, including to pay for many beneficiaries to travel to San Diego to attend the mediation.

After appointing the new corporate trustee, Judge Cline granted the Gaynor beneficiaries' attorney fees motion, awarding them $260,948.34, reflecting amounts incurred in bringing and/or defending the Petition to Modify, the Petition to Appoint, and the Petition to Construe. The court awarded the fees under equitable principles and on a

7

common fund theory, concluding the Gaynor beneficiaries' efforts substantially benefited the younger generations. In its written order, the court stated:

> "At all times, the individual [Cotrustees] engaged in a distribution practice that benefitted only the senior generation of trust beneficiaries. . . . While the distribution provisions of the [T]rust may have some ambiguities, a clear reading of the [T]rust suggests that the distribution practice followed by the individual trustees for twenty years was contrary to the terms of the trust. The [Cotrustees] should not have excluded younger beneficiaries and beneficiaries having financial needs. . . . [¶] . . . Over the past twenty years there has been in excess of three million dollars distributed to the senior generation. None of the younger generations have been offered or have received anything. . . . Although the court was not asked to rule on the extent to which the individual [Cotrustees] performed their duties, and it specifically declines to do so now, *there is prima facie evidence that the [Cotrustees] breached their duties in carrying out the senior-generation-only distribution policy*." (Italics added.)

The Cotrustees (Edwin and Christopher; Mary died in March 2013) appealed the order, and in November 2014, this court affirmed the order. (*Gaynor v. Bulen* (Nov. 20, 2014, D064872) (nonpub. opn.) (*Gaynor I*).) We held the court acted within its equitable discretion in awarding fees to the Gaynor beneficiaries under the common fund doctrine. (*Ibid.*)

In January 2015, the court-appointed successor trustee paid the Gaynor beneficiaries $260,948.34 plus interest of $40,958.16 for the ordered attorney fees. The trustee made this payment from the Trust assets.

*The Current Petition*

In November 2012, the Gaynor beneficiaries filed the initial surcharge petition against the Cotrustees (Edwin, Christopher, and Mary) seeking an accounting and to surcharge these Cotrustees for breaches of fiduciary duty.

8

About 10 months after this court filed *Gaynor I*, the Gaynor beneficiaries filed an amended surcharge petition (Second Amended Petition), adding James as a party based on his alleged "de facto" trustee status in assisting and encouraging the Cotrustees in their prior alleged wrongful actions.[4] The Gaynor beneficiaries alleged correspondence produced by James's former law firm (DLA Piper) in November 2014 through March 2015 alerted them for the first time that James had "assum[ed] authority over Trust assets . . . by intermeddling in the [Cotrustees'] duties, by participating in communications and decisions with the [Cotrustees], and by making decisions on behalf of or in place of one or more of the [Cotrustees]."

The legal basis for the Second Amended Petition was a single breach of fiduciary duty cause of action, in which the Gaynor beneficiaries identified about 25 separate breaches committed by the Cotrustees (with James's alleged advice and assistance). Each of the alleged breaches concerned the Cotrustees' and James's actions taken to benefit themselves to the detriment of the remaining beneficiaries. The alleged breaches fell into five main categories: (1) income distribution decisions (e.g., distributing income only to the senior generation; failing to inform beneficiaries of their right to receive income;

---

[4]    In their petition, the Gaynor beneficiaries refer to James as a "trustee *de son tort*," which describes a person who is not a trustee, but has "undertaken to act in the capacity of a trustee" and thus may be held liable as a trustee under certain circumstances. (See *King v. Johnston* (2009) 178 Cal.App.4th 1488, 1504-1506.) For ease of reference, we will refer to this status as a "de facto trustee." Although James was a licensed attorney, the de facto trustee allegations are based on his role as an unofficial advisor to the other trustees and not as an attorney.

　　　　The Gaynor beneficiaries also named Catherine, Mary's daughter, as a de facto trustee. Because she is not a party to this appeal, we do not describe the allegations against Catherine except as they are relevant to the claims against James.

failing to distribute assets to Mary's son, who was in ill health; improperly delegating distribution decisions to Catherine); (2) conduct pertaining to the Shopping Center LLC (e.g., improperly transferring the main Trust asset (shopping center lease) into this entity; wrongfully arranging for Mary to assign her shares to Catherine); (3) alleged failures to provide Trust accountings; (4) alleged actions to hide Mary's mental incompetence from Mary's family and continuing to have Mary sign pleadings "to avoid a [trustee] vacancy in the Mary Bulen branch" and/or to replace Mary under the 1990 Plan; and (5) proposing and seeking the adoption of the new trustee succession plan that would benefit only the Cotrustees and the senior generation beneficiaries. As will be discussed in more detail below, this latter category included allegations that in seeking the adoption of this new plan, the Cotrustees and James "wast[ed] Trust assets" on attorney fees and costs to file, support, and/or defend the Petition to Modify, the Petition to Appoint, the Petition to Construe, the mediation efforts, and the attorney fees petition.

Regarding remedies, the Gaynor beneficiaries asked the court to require modification of the Shopping Center LLC agreement to ensure the junior beneficiaries' rights were protected, and to surcharge the Cotrustees and James by requiring them to reimburse the Trust for the legal fees and costs "wasted by them, and the damages caused by them, as a result of the foregoing breaches," including for the legal fees and costs incurred by the Trust in the prior litigation and in preparing and implementing the LLC operating agreement; the Trust's lost value in connection with the Shopping Center LLC; and the improper distributions to senior-generation family members. The Gaynor beneficiaries acknowledged the Trust had reimbursed them for most of their own

10

litigation-related fees and costs (pursuant to the prior court order), but they sought certain additional costs/fees, consisting of: (1) $40,000 incurred to defend the *Gaynor I* appeal; and (2) $33,045 in attorney fees that were not part of the earlier award because the court found these fees were not incurred to benefit the beneficiary class.

The Gaynor beneficiaries sought double damages under Probate Code section 859, which provides: "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a . . . trust . . . the person shall be liable for twice the value of the property recovered by an action." They also sought punitive damages based on allegations the Cotrustees and James "acted with oppression, and malice, and despicable conduct," and requested their attorney fees in the current action.

*Anti-SLAPP Motion*

Shortly after the Gaynor beneficiaries filed this Second Amended Petition, James filed an anti-SLAPP motion to strike the claims against him. He argued the "gravamen" of the petition arose from his alleged participation in the probate litigation, and these actions were in furtherance of his constitutional right to petition. James also argued the Gaynor beneficiaries could not meet their burden to show a probability of prevailing because the claims against him are barred by the applicable statute of limitations and the litigation privilege. On the statute of limitations defense, James presented evidence showing the Gaynor beneficiaries knew of his alleged role as advisor to the Cotrustees since 2005, and at the very latest in July 2012, more than three years before the Second Amended Petition was filed.

11

The Gaynor beneficiaries countered that the anti-SLAPP statute did not apply because their claims arose from James's breach of the "duty of loyalty that occurred long before the [Cotrustees] stepped into the courtroom," and that the " 'principal thrust' of the Petition is aimed at . . . breaches of [James's] duties of loyalty that occurred independently of any litigation that was filed." The Gaynor beneficiaries additionally maintained they could meet their burden to show a probability of prevailing on their claims. They argued and presented evidence showing the Cotrustees violated their fiduciary duties in numerous ways, and that "discovery recently obtained . . . reveals that [James] routinely assumed the role of lead advisor and decision maker to the other" Cotrustees during "a period of at least 10 years." They also argued the limitations defense was inapplicable because the Cotrustees and James had withheld numerous relevant emails of which the Gaynor beneficiaries were unaware until March 2015.

After a hearing, the court (Superior Court Judge Julia Kelety) denied the anti-SLAPP motion, finding the statute did not apply to the claims against James, and thus the court did not reach the second step of the anti-SLAPP analysis. The court discussed the "primary right" theory,[5] but also found "James's involvement in litigation adverse to [the Gaynor beneficiaries] [was] 'mere evidence' of his alleged breach of the fiduciary duties owed to [the Gaynor beneficiaries]" and thus the claims against him did not arise from his constitutionally-protected actions. The court found "persuasive" the Gaynor

---

5    After the court issued this order, the California Supreme Court rejected the primary right theory as relevant to defining a "cause of action" in the anti-SLAPP analysis. (See *Baral v*. *Schnitt* (2016) 1 Cal.5th 376, 394-395 (*Baral*).)

12

beneficiaries' argument "that an analogy can be made between allegations of breaches of fiduciary duties by trustees and California authority pertaining to attorney malpractice," stating " ' "California courts have held that when a claim [by a client against a lawyer] is based on a breach of the fiduciary duty of loyalty or negligence, it does not concern a right of petition or free speech, though those activities arose from the filing, prosecution of and statements made in the course of the client's lawsuit.  The reason is that the lawsuit concerns a breach of duty that does not depend on the exercise of a constitutional right." ' "

DISCUSSION

## I. *Anti-SLAPP Law*

California's anti-SLAPP statute provides:  "A cause of action against a person arising from any act of that person in furtherance of the person's [constitutional] right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines . . . there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)  This statute "provides a procedure for weeding out, at an early stage, meritless claims arising from [specified constitutionally] protected activity."  (*Baral*, *supra*, 1 Cal.5th at p. 384, italics omitted.)  The statute seeks " 'to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. [Citation.]  The Legislature has declared that the statute must be "construed broadly" to that end.' "  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268.)  "The point . . . is that you have a right *not* to be dragged through the courts because you exercised your

13

constitutional rights." (*People ex rel Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1317.)

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral, supra,* 1 Cal.5th at p. 384.) We conduct a de novo review of a trial court's order denying an anti-SLAPP motion. (*Park, supra,* 2 Cal.5th at p. 1067.) We therefore analyze the issues independent of the trial court's reasoning. (*Ibid.*) "If the trial court's decision is correct on any theory . . . , we affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion." (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 573.)

## II. *First Step: "Arising From" Requirement*

### A. *Legal Principles*

Under the first step of the anti-SLAPP analysis, the moving party must show (1) the complaint alleges *protected speech or conduct*, and (2) the "relief is sought based on allegations *arising from*" the protected activity. (*Baral, supra,* 1 Cal.5th at p. 396, italics added; accord *Park, supra,* 2 Cal.5th at pp. 1061, 1062-1063.)

On the protected speech/conduct requirement, the statute identifies four categories of actions that are " 'in furtherance of' " a defendant's free speech or petition rights: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral

14

statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e); see *City of Montebello v*. *Vasquez* (2016) 1 Cal.5th 409, 422.)

On the "arising from" requirement (§ 425.16, subd. (b)(1)), the defendant must show "the defendant's act underlying the plaintiff's cause of action [was] *itself*" a protected act.  (*City of Cotati v*. *Cashman* (2002) 29 Cal.4th 69, 78.)  "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute."  (*Navellier v*. *Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).)  Instead, the focus is on determining what "the defendant's *activity* [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning."  (*Id*. at p. 92; accord *Cotati*, at p. 78.)

In recently clarifying these "arising from" principles, the California Supreme Court emphasized the need for courts to determine whether the protected activity was the alleged injury-producing act that formed the basis for the claim.  (*Park*, *supra*, 2 Cal.5th at pp. 1062-1063.)  The high court explained:  " 'The only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e). . . .' "  (*Id*. at p. 1063.)

15

The *Park* court thus instructed that "in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Ibid.*) In so doing, the courts should be "attuned to and . . . respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity *or provide evidentiary support for the claim.*" (*Id.* at p. 1064, italics added; accord, *Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1214-1215.)

Under these principles, the *Park* court held the anti-SLAPP statute did not apply to a college-tenure discrimination claim despite the plaintiff's allegations that the college dean made discriminatory comments in the tenure process (assumed to be protected communications under the anti-SLAPP statute). (*Park, supra,* 2 Cal.5th at pp. 1067-1073.) The high court reasoned that the plaintiff's allegation of protected communications was insufficient to establish the plaintiff's *discrimination claim* arose from the protected activity. (*Id.* at pp. 1067-1068.) The court stated: "The elements of [the plaintiff's] claim . . . depend . . . only on the denial of tenure itself and whether the motive for that action was impermissible. . . . The dean's alleged comments may supply evidence of animus, but that does not convert the statements themselves into the *basis for liability.* . . . [The plaintiff's] complaint is '*based on the act of denying plaintiff tenure based on national origin.* Plaintiff could have omitted allegations regarding communicative acts or filing a grievance and still state the same [discrimination] claims.' " (*Id.* at p. 1068, italics added.) In this analysis, the court suggested that if the

16

same facts had been alleged in support of a defamation claim, the result might have been different because that claim would have been " 'based squarely on a privileged communication.' "  (*Id*. at p. 1064, 1068-1071.)

*Park* was filed about nine months after *Baral*, in which the high court resolved a conflict among California Courts of Appeal on "mixed" causes of action, and held an anti-SLAPP motion may be used to strike particular claims of protected activity even without defeating a pleaded "cause of action" or "primary right."  (*Baral*, *supra*, 1 Cal.5th at pp. 381-382, 384-396.)  In defining a claim properly subject to a motion to strike, the *Baral* court stated the Legislature "had in mind *allegations of protected activity that are asserted as grounds for relief*.  The targeted claim must amount to a 'cause of action' in the sense that it is alleged to justify a remedy."  (*Id*. at p. 395.)

### B.  *Analysis*

The Gaynor beneficiaries alleged a single breach of fiduciary duty cause of action against James, claiming he participated with the Cotrustees to take actions that would wrongfully benefit the senior beneficiaries to the detriment of the Gaynor beneficiaries and other more junior beneficiaries.  Within that cause of action, the Gaynor beneficiaries identified about 25 examples of wrongful conduct that reflected James's alleged breach of fiduciary duty.  James acknowledges that most of these alleged acts do not constitute protected activity, including the alleged unfair and self-serving income-distribution decisions, the alleged improper transfer of the shopping center property into the Shopping Center LLC, the plan to alter the Trust provisions in a manner that would benefit only the senior beneficiaries, the failure to provide proper accountings, and actions allegedly taken

17

to "hide" Mary's mental incompetence from her family. James thus does not seek to strike these allegations and acknowledges they remain regardless of the outcome of this appeal.

But James argues that other paragraphs of the petition allege protected activity, and contends the court erred in failing to determine these allegations triggered the Gaynor beneficiaries' obligation to establish a probability of prevailing on these claims. (See *Baral, supra,* 1 Cal.5th at pp. 392-396 [anti-SLAPP statute triggered when relief is sought based on a claim alleging protected activity, even if relief is also sought based on alleged unprotected activity].) Specifically, in these paragraphs, the Gaynor beneficiaries alleged that the Cotrustees and James violated their statutory duties of loyalty and fair treatment by "wasting Trust assets" on legal fees and costs to pursue the Petition to Modify, Petition to Appoint, Petition to Construe Trust, and the mediation; and wrongfully forced the Gaynor beneficiaries to spend funds to oppose/defend these petitions and activities. James argues the allegations that Trust assets were "wast[ed]" *on* probate litigation constitute claims he engaged in constitutionally protected activity and thus entitles him to anti-SLAPP protection.

This argument is unavailing because the allegation that Trust assets were improperly used on the probate litigation was not a separate legal claim, but merely reflected the manner in which the Cotrustees and James implemented their alleged wrongful plan to alter the trustee succession rules to favor their own interests. The *Baral* court defined a "claim" properly subject to a section 425.16 motion as "allegations of protected activity that are asserted as grounds for relief." (*Baral, supra,* 1 Cal.5th at p.

18

395, italics omitted.) The allegations asserted as grounds for relief against James were predicated on his taking actions to favor himself to the detriment of the Gaynor beneficiaries. There is nothing in the *Baral* decision suggesting the high court envisioned so narrowly parsing the allegations of a complaint to trigger anti-SLAPP protection based solely on illustrations of alleged disloyal conduct by a fiduciary.

Even if we were to consider the "wasting trust assets" allegations as a separate "claim," James's appellate contention is without merit. We agree that filing petitions, motions, and briefs in court (and/or assisting in the filing) are protected petitioning activities under the anti-SLAPP statute. (See § 425.16, subd. (e)(2); *Nunez v. Pennisi* (2015) 241 Cal.App.4th 861, 872; *Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 491 (*Castleman*); *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 823-824.) But the Gaynor beneficiaries' breach of fiduciary claim was not *based* on these protected activities. According to the allegations of the Second Amended Petition and the submitted evidence, the Cotrustees (with James's advice and assistance) filed the prior probate petitions and motions as part of their plan to change the trustee succession rules to allow the Cotrustees to operate and control the Trust to advantage a select portion of the beneficiaries. Thus, the activity giving rise to the Gaynor beneficiaries' alleged harm was the breach of loyalty in formulating and pursuing this plan and the improper use of Trust assets to wrongfully benefit James and the Cotrustees. Although the alleged breach of loyalty may have been carried out by the filing of probate petitions, it was not the petitioning activity itself that is the basis for the breach of fiduciary claim. (See *Park, supra,* 2 Cal.5th at p. 1066 ["while [the alleged wrongful conduct] may be carried out by

19

means of [protected] speech . . . , [this] circumstance [does not] transform[ ] [the] suit to one arising from speech"].)  The litigation activities (e.g., the filing and/or defense of the Petitions to Modify, Appoint, and Construe) would provide *evidence* of the alleged breaches of fiduciary duty, but the filing of these petitions were not necessary to establish this portion of the breach of fiduciary duty claim.  (See *id.* at p. 1068.)

This conclusion is consistent with decisions involving a client's malpractice or breach of fiduciary claim against the client's former attorney for breaching duties owed to the client.  The courts have held a client's claims against his or her former attorney are not subject to the anti-SLAPP statute because the client is seeking recovery for the attorney's failure to competently represent the client's interests and/or the attorney's breach of loyalty owed to the client, and not to recover for injuries resulting from the attorney's petitioning activities, even if these activities were alleged to be wrongful and harmful to the client's interests.  (See *Loanvest I*, *LLC v. Utrecht* (2015) 235 Cal.App.4th 496, 505 [the "fact that the complaint 'focus[es] specifically on particular statements or positions taken in connection with matters under review by a court,' . . . does not alter the fact that the claim is . . . based on the alleged breach of loyalty owed to" the plaintiff]; *Castleman*, *supra*, 216 Cal.App.4th at pp. 494, 490-496 ["[a]lthough protected speech and petitioning are part of the 'evidentiary landscape' within which the action arose, the claims are ultimately based on the allegation that [the attorney] engaged in conduct inconsistent with the fiduciary obligations he owed to the respondents"]; *Benasra v. Mitchell Silberberg & Knupp LLP* (2004) 123 Cal.App.4th 1179, 1189 ["claim is not based on 'filing a petition for arbitration on behalf of one client against another, but

20

rather, for failing to maintain loyalty to, and the confidences of, a client' "]; see also *Chodos v. Cole* (2012) 210 Cal.App.4th 692, 702-703; *Aguilar v. Goldstein* (2012) 207 Cal.App.4th 1152, 1160-1163; *Freeman v. Schack* (2007) 154 Cal.App.4th 719, 727-730; *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1536-1540.) Similarly, here the Gaynor beneficiaries are suing James because he allegedly breached his duties of loyalty and fair treatment, and not because he exercised his petitioning rights.

James argues the Gaynor beneficiaries alleged he committed a breach of fiduciary duty merely by filing probate petitions that disfavored their interests (or encouraged/advised others to do so). When the petitioning activity itself is considered the tort upon which the subsequent lawsuit is based and for which relief is sought, the claim by definition falls within the purview of the anti-SLAPP statute. (See *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 735 [malicious prosecution claim triggers anti-SLAPP protection].) But the gist of the Gaynor beneficiaries' claims challenging James's litigation activities is the breach of loyalty owed to the Trust beneficiaries and the subsequent loss of the funds alleged to have been wrongfully withdrawn from the Trust. The Gaynor beneficiaries allege injury to the Trust and seek to surcharge James by requiring him to repay the Trust for the costs to fund the petitions (including the Gaynor beneficiaries' attorney fees that were ordered paid by the Trust). The wrongful conduct that produced this injury was not the litigation itself; instead the injury was the result of James's formulation and advocacy of the plan to maintain control of the Trust to the detriment of other beneficiaries and the withdrawal of Trust funds for

21

this purpose. The fact that the Cotrustees and James made the decision to, and did, file petitions in court to achieve their alleged improper objectives does not mean the Second Amended Petition, or a claim within the petition, was *based* on ("arose from") the filing of these petitions.

Although the form of the claim or cause of action (malicious prosecution versus a breach of fiduciary duty) does not determine the applicability of the anti-SLAPP statute (see *Navellier*, *supra*, 29 Cal.4th at pp. 90-93), the *Park* court clarified that in evaluating the "arising from" requirement, a court "should consider the elements of the challenged claim" to determine "what actions by the defendant supply those elements and consequently form the *basis* for liability." (*Park*, *supra*, 2 Cal.5th at p. 1063, italics added.) Here, the Gaynor beneficiaries' breach of fiduciary duty claim is expressly based on statutes requiring a trustee to administer a trust according to the trust instrument (Prob. Code, § 16000); solely in the interest of the beneficiaries (*id.*, § 16002); in an impartial manner (*id.*, § 16003); without a conflict of interest (*id.*, § 16004); to control and preserve trust property (*id.*, § 16006); to make trust property productive (*id.*, § 16007); and to reasonably prevent losses to Trust assets (*id.*, § 16011). As alleged in the Second Amended Petition, James violated these statutes by formulating and advocating a plan that would disadvantage the Gaynor beneficiaries' interests and by implementing the plan through the withdrawal of Trust assets. The fact that the assets were then used for various alleged improper purposes, including to fund the probate litigation, provides evidence to support the claim for breach of these code sections, but is not an essential element of the claim.

22

A recent Court of Appeal decision illustrates these principles. (*Greco v. Greco* (2016) 2 Cal.App.5th 810 (*Greco*).) In *Greco*, a beneficiary of her deceased parents' trust and estates sued her brother in civil court for elder abuse, and in probate court for breaches of fiduciary duty. (*Id*. at pp. 816-817.) In both actions, the sister alleged the brother (as the trustee of the trust and executor of the estates) filed litigation against her in bad faith and for improper reasons, and wrongfully used trust and estate funds for these purposes. (*Ibid*.) Similar to here, she alleged the brother breached the " 'duty to act with utmost good faith . . . , the duty of loyalty . . . , the duty to treat all beneficiaries equally . . . , the duty to act according to the Trust and Estates documents, the duty to avoid self-dealing . . . , and the duty to avoid conflicts of interest.' " (*Ibid*.) In the breach of fiduciary duty claim, the sister alleged her brother " 'engaged in a course of conduct . . . fomenting litigation and other wrongful acts, against . . . beneficiaries of the Trust and/or estate, in an attempt to disinherit them . . . and/or prevent questioning of his actions.' " (*Id*. at p. 817.) The brother responded by filing anti-SLAPP motions, contending the sister's claims "arose from actions and communications in the underlying litigation and therefore were protected activity." (*Id.* at p. 818.) The sister countered that "the gravamen of the [claims] was that by taking money to pursue his personal vendetta, [the brother] wrongfully took money in breach of his fiduciary duties." (*Ibid*.) Supporting declarations showed the brother withdrew substantial funds from the trust and estates to fund the underlying litigation. (*Ibid*.)

The trial court found the anti-SLAPP statute did not apply, and the Court of Appeal affirmed on the breach of fiduciary duty and elder abuse claims. (*Greco*, *supra*, 2

23

Cal.App.5th at pp. 818-819, 821-825.)  On the elder abuse claim, the court determined that "it was [the brother's] withdrawal of the funds from the trust and estates that was the alleged wrongful act . . . .  Although [the sister] did allege the underlying lawsuits were wrongful, her claim for recovery was not based on the wrongful act of pursuing meritless or wasteful litigation, but on taking trust and estate funds." (*Id.* at p. 823.)  The court explained:  "Funding the litigation solely to pursue a vendetta was the *reason* the activity (i.e., the taking) was allegedly wrongful . . . .  The test under section 425.16 focuses on . . . 'the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.'  [Citation.] [¶] The taking, whether or not it is actually wrongful and why, does not fall within any of the conduct described in subdivision (e) of section 425.16." (*Id.* at pp. 823-824.)

The *Greco* court applied similar reasoning on the breach of fiduciary duty claims. (*Greco*, *supra*, 2 Cal.App.5th at pp. 824-825; *id.* at p. 825 ["For the same reasons we detailed . . . in our discussion of the elder abuse claims, the court did not err in denying the" SLAPP motion on the breach of fiduciary cause of action.].)  The court also observed that "[w]hile [the breach of fiduciary duty] allegations appear to challenge the bringing of the underlying litigation, a protected activity, the [sister's claim] limits the act that caused injury to the taking.  In seeking damages and penalties, the [sister's] petition alleges that [the brother] 'in bad faith wrongfully took, and/or concealed, and/or disposed of, property belonging to a principal under a power of attorney' and 'in bad faith wrongfully took, and/or concealed, and/or disposed of, property belonging to a trust and/or estate(s).'  There is no allegation that the 'fomenting litigation' or the alleged

24

attempt to disinherit certain beneficiaries *caused any injury*; the only *'wrongful injurious act*(*s*) alleged by the plaintiff' [citation] is the *taking*. Thus, the gravamen of this cause of action for purposes of section 425.16 is the taking itself, not the reason for the taking which is alleged to have made the taking wrongful." (*Id.* at p. 825.)

Although *Greco* was filed before *Park*, *Greco*'s holding is consistent with *Park*. The *Greco* court focused on the factual basis for the claims and concluded the injury-producing activity was not the alleged wrongful filing of the lawsuits, and instead it was the use of trust assets to disadvantage the sister's interests. (*Greco*, *supra*, 2 Cal.App.5th at pp. 821-825.) We have reached a similar conclusion here. The alleged injury-producing conduct was not James's litigation activities, but the formulation of a plan to disadvantage the junior beneficiaries' interests and the withdrawal of funds for a purpose that was allegedly inconsistent with these beneficiaries' interests and Grandfather's intent. The litigation is evidence of the breach of loyalty, but not the basis of the claim.[6]

James argues that in this case, unlike in *Greco*, the Gaynor beneficiaries sought certain damages resulting from the prior probate litigation: (1) the $40,000 in attorney fees incurred in defending the *Gaynor I* appeal; and (2) the $33,045 in attorney fees the probate court declined to award in the prior litigation based on its finding that these fees were not incurred to benefit the entire class of beneficiaries. These damage allegations

---

6      On a different claim (misrepresentation), the *Greco* court found the brother met his anti-SLAPP burden because "[u]nlike the [breach of fiduciary] causes of action, the gravamen of this cause of action is not the taking, but alleged misrepresentations about the underlying litigation." (*Greco*, *supra*, 2 Cal.App.5th at p. 825.) This holding is not helpful to James because in this case the Gaynor beneficiaries do not seek to recover for harm resulting from any alleged misrepresentations.

25

do not take this case outside *Greco's* rationale because the anti-SLAPP statute's focus is on the defendant's alleged injurious speech or conduct, "rather than the damage which flows from said conduct." (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 396.) Moreover, these damage allegations are incidental to the Gaynor beneficiaries' legal claim at issue and thus do not independently trigger anti-SLAPP protection. (See *Baral*, *supra*, 1 Cal.5th at p. 394 [reiterating that "[a]ssertions that are 'merely incidental' . . . are not subject to section 425.16"].) First, as to the $40,000 incurred in defending the *Gaynor I* appeal, these funds were recoverable under the probate court's prior order (affirmed on appeal) permitting recovery of the Gaynor beneficiaries' attorney fees on a common fund theory. (*Gaynor I*, *supra*, D064872.) With respect to the second category of claimed fees, the probate court has already found they are not recoverable because they did not benefit the class of beneficiaries. (*Ibid*.) Although we do not reach the merits in the first step of the anti-SLAPP analysis, we can properly consider the undisputed facts in determining whether the claim arose from protected activity.

In his reply brief James challenges *Greco*'s holding on the ground that the *Greco* court did not mention the high court's *Baral* decision (*Greco* was filed about three weeks after *Baral*). However, *Baral* involved the second step of the anti-SLAPP analysis and addressed issues not in dispute in *Greco*, e.g., " 'mixed cause[s] of action.' " (*Baral*, *supra*, 1 Cal.5th at pp. 381, 385, 396.) Because *Baral* was not directly relevant to the issues raised in *Greco,* this criticism of *Greco* is unavailing.

26

James devotes much of his reply brief to discussing a Court of Appeal decision, *Sheley v. Harrop* (2017) 9 Cal.App.5th 1147 (*Sheley*), filed about seven months after *Greco*. *Sheley* held the anti-SLAPP statute applied to breach of fiduciary duty claims involving alleged wrongful litigation by a corporation's controlling members. (*Id*. at pp. 1165-1170.) Although *Sheley* and *Greco* were both decided by the Third District Court of Appeal, and involved similar issues, *Sheley* did not cite or discuss *Greco*.

In *Sheley*, the decedent had owned all of the shares of a corporation. (*Sheley*, *supra*, 9 Cal.App.5th at p. 1154.) After he died, his second wife owned 25 percent of the shares and his two adult daughters from his first marriage owned the remaining 75 percent. (*Ibid*.) When the daughters assumed control of the corporation, the corporation sued the second wife. (*Id*. at pp. 1154-1155.) The second wife then filed a cross-complaint against the daughters, asserting three causes of action: (1) breach of fiduciary duty, alleging the daughters breached duties by " 'paying themselves excessive salaries, by wrongfully converting corporate assets, *by filing and maintaining a frivolous lawsuit against* [*her*], and by failing to make pro-rata disbursements to [her] as a minority shareholder of the corporation' "; (2) conversion, alleging the daughters " 'willfully, intentionally and wrongfully converted corporate assets . . . to their own use by, among other things, paying themselves excessive salaries, making disbursements [only] to themselves . . . , and *by wrongfully utilizing corporate assets to fund the above-captioned frivolous lawsuit brought in bad faith against* [the second wife]' "; and (3) negligence, alleging the daughters " 'fail[ed] to make timely disbursements to [her] as a minority shareholder . . . , *wrongfully depleting and wasting corporate assets to fund the instant*

27

*litigation against* [*her*] *without any reasonable justification*, and by paying themselves excessive salaries as officers . . . , thereby further wasting corporate assets.' " (*Id*. at p. 1155.)

The daughters moved to strike the cross-complaint under the anti-SLAPP statute, arguing the allegations relating to filing and maintaining the prior lawsuit constituted "protected activities." (*Sheley*, *supra*, 9 Cal.App.5th at pp. 1155-1156.) The trial court denied the motion. (*Id*. at p. 1159.) In reversing, the *Sheley* court first discussed its finding that the litigation-related allegations constituted a "claim" subject to the anti-SLAPP statute under the recent *Baral* "mixed" cause of action decision. (*Sheley*, at pp. 1165-1170.) The court then found the litigation allegations arose from protected activity, reasoning these allegations were not "incidental" to the second wife's claimed injuries, and did not merely "provide context" for the claims. (*Id*. at p. 1167.) In reaching these conclusions, the *Sheley* court declined to follow *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, which held a plaintiff's claims against his corporate partners for activities related to the hiring of attorneys and filing a lawsuit were not subject to anti-SLAPP protection because "the gravamen of [the plaintiff's] complaint is not that [the defendant's] petitioning activity caused him harm, but that his wasteful and unnecessary spending on attorneys and investigators did." (*Baharian-Mehr*, at p. 273.) The *Sheley* court criticized *Baharian-Mehr*'s reasoning based on the *Sheley* court's view that the "primary thrust" or "gravamen" approach to evaluating anti-SLAPP motions is no longer viable after *Baral*, *supra*, 1 Cal.5th 376. (*Sheley*, at p. 1169.)

28

We find *Sheley*'s analysis unpersuasive on the "arising from" element. (§ 425.16, subd. (b).) *Sheley* was decided before *Park*, and did not have the benefit of *Park*'s clear admonitions regarding the need to identify the specific elements of the claim relied upon by the defendant to invoke the anti-SLAPP statute. (*Park*, *supra*, 2 Cal.5th at pp. 1062-1073.) Under *Park*, the allegations of wrongful litigation in *Sheley* arguably did not form the basis for the claims, and instead were examples of the claimed breach of duties. Additionally, we have some concern with *Sheley*'s criticism of the "primary thrust" or gravamen" analysis. The "principal thrust" or "gravamen" is a shorthand way of describing the need to show—with respect to each targeted claim—that the alleged wrongful and injury-producing conduct was not incidental and fell within one of the four categories enumerated in section 426.16, subdivision (e). (See *Castleman*, *supra*, 216 Cal.App.4th at pp. 490-492.) This form of analysis is consistent with recent California Supreme Court authority. In *Baral*, the high court held that claims (rather than technical "causes of action") may be subject to a strike motion, but reiterated that the statute is not triggered by " 'incidental' " allegations. (*Baral*, *supra*, 1 Cal.5th at pp. 394-395.) *Park* reaffirmed the defendant's burden to establish a nexus between the protected act and the core basis for the alleged injury. (*Park*, *supra*, 2 Cal.5th at pp. 1062-1064.) Thus, under *Park* and *Baral*, a court must continue to analyze whether the allegations of protected activity within each "claim" are incidental or whether the principal thrust of the claim triggers anti-SLAPP protection. (See *Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 588-590 [rejecting *Sheley*'s view on anti-SLAPP "gravamen" analysis].)

29

Citing our recent decision in *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76 (*San Diegans*), James argues the *funding* of litigation is "clearly protected conduct."[7]  In the cited portion of the opinion, the court was referring to section 425.16, subdivision (e)(4), which is not at issue here.  (*San Diegans,* at pp. 93-94.)  James also cites *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, a gender discrimination case, for the proposition that litigation funding " 'decisions' " are protected communications under section 425.16, subdivision (e)(2).  However, the *Park* court disapproved of *Tuszynska* to the extent it held the plaintiff's claims arose from communications rather than from the alleged discriminatory actions.  (*Park*, *supra*, 2 Cal.5th at p. 1071.)

Even assuming the funding of litigation is an act protected under section 425.16, subdivision (e)(2), the fact that the Gaynor beneficiaries challenged James's involvement in the funding of the probate litigation does not alter our conclusions.  The critical point is that even assuming James allegedly engaged in protected activities by his litigation actions, he still has the burden to show the Gaynor beneficiaries' breach of fiduciary claim arose from these activities.  We have concluded he did not make this showing.

Also relying on *San Diegans*, *supra,* 13 Cal.App.5th 76, James argues the trial court failed to distinguish " 'allegations of conduct on which liability is based from allegations of motives for such conduct.' "  We agree these two concepts must be

---

7      After briefing was completed, the California Supreme Court granted a petition for review in the *San Diegans* case.  (*San Diegans*, *supra*, 13 Cal.App.5th 76, review granted Aug. 16, 2017, S242529.)

distinguished, and that the anti-SLAPP statute is triggered only when the alleged injury-producing conduct is protected activity, not merely the motivating conduct for that activity. But we disagree with James that the allegations of breach of loyalty and self-dealing constituted only the motive for the protected conduct (filing of the lawsuits). James is describing a malicious prosecution claim, which the Gaynor beneficiaries did not assert. The allegations of breach of loyalty and self-dealing (the improper use of Trust assets on matters detrimental to the beneficiaries) is the alleged injury-producing conduct, and the filing of the lawsuits is evidence to show the breach and the resulting harm to the beneficiaries.

In reaching our conclusions, we are mindful of *Park*'s admonition regarding the importance of carefully applying section 425.16's "arising from" requirement in governmental-abuse and discrimination claims to ensure the legislative intent underlying the anti-SLAPP statute is effectuated. (*Park*, *supra*, 2 Cal.5th at p. 1067.) Similar concerns arise in analyzing a probate petition challenging a fiduciary's actions that allegedly improperly depleted trust assets. Holding that a trust beneficiary's surcharge petition is subject to an anti-SLAPP petition whenever a beneficiary challenges the trustee's use of trust assets to fund self-serving litigation would significantly deter beneficiaries from bringing such actions. If a fiduciary could strike breach of duty claims at the pleading stage before discovery and subject the beneficiaries to attorney fee awards, this would substantially burden a *beneficiary's* constitutional petition rights and undermine the Probate Code protections for beneficiaries, thereby reducing the probate court's ability to monitor trustee activities. *Park* instructed the courts to look closely at

31

the allegations of the pleading when ruling on an anti-SLAPP motion, and to "respect the distinction" between protected activity that provides the basis for liability and protected activity that provides evidence of liability. (*Park,* at p. 1064.) Here, the allegations of protected activity do not form the *basis* for liability.

## DISPOSITION

Order affirmed. Appellant to bear respondents' costs on appeal.

HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


DATO, J.