Filed 1/5/23

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| LAURA WHITE, as Trustee, etc., | |
| Plaintiff and Appellant, | E077320 |
| v. | (Super.Ct.No. PRIN2000353) |
| RUSSELL LOWELL DAVIS et al., | OPINION |
| Defendants and Appellants. | |


APPEAL from the Superior Court of Riverside County. Kenneth J. Fernandez, Judge. Affirmed and remanded with directions.

Herzog, Yuhas, Ehrlich & Ardell, Ian Herzog, Evan D. Marshall; Law Offices of Steven Glick, Stephen Glick and M. Anthony Jenkins for Defendants and Appellants.

Sheppard, Mullin, Richter & Hampton, Adam F. Streisand, Nicholas J. Van Brunt and Valerie E Alter for Plaintiff and Appellant Laura K. White.

Defendants and appellants Russell Lowell Davis (Davis), Ian Herzog (Herzog), Evan D. Marshall (Marshall), Debra Wear (Wear), Gloria Tedesco (Gloria), and Stephen Carpenter (Carpenter) (collectively defendants) appeal from the March 22, 2021 order, which denied each of their special motions to strike (Code Civ. Proc., § 425.16; anti-SLAPP statute)[1] the corresponding applications for elder abuse restraining orders (EARO) filed by plaintiff and appellant Laura White (White), as cotrustee of the Thomas S. Tedesco Living Trust (the living trust), to protect her father, conservatee Thomas S. Tedesco (Thomas) from defendants' concerted efforts to isolate and unduly influence him to change his estate plan for their benefit.[2]  White cross-appeals from the same order denying her request to hear the EARO applications prior to the anti-SLAPP motions.

On appeal, defendants contend that (1) White has no standing to request the EAROs because she is unable to establish that she is either a trustee of the living trust or fiduciary of Thomas; (2) the lower court erred in assuming the conservatorship is valid and White is a cotrustee of the living trust, and relying on this court's opinions affirming the probate court's actions; (3) the court erred by denying defendants' anti-SLAPP

---

[1] "SLAPP is an acronym for 'strategic lawsuits against public participation.'" (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 413, fn 2.)

[2] We refer to some of the parties by their first names to avoid confusion.  We mean no disrespect in doing so.  (*Estate of O'Connor* (2018) 26 Cal.App.5th 871, 875, fn. 2.)
White filed six separate applications for EAROs; therefore, there are six separate cases:  PRIN2000353 (Davis), PRIN2000355 (Marshall), PRIN2000357 (Gloria), PRIN2000359 (Carpenter), PRIN2000360 (Herzog), and PRIN2000361 (Wear).  On October 30, 2020, the superior court consolidated these cases and designated case No. PRIN2000353 as the master file.

2

motions; (4) their assistance in asserting Thomas's civil and testamentary rights cannot be restrained by an EARO to prevent them from seeking a judicial determination that will resolve the very issue raised by the EARO; (5) the EAROs must be stricken because they interfere with Orange County's exclusive subject matter jurisdiction; and (6) the court erred in proceeding without joinder by Thomas.

In response, White asserts that Wear's anti-SLAPP motion is moot given this court's affirmance of the EARO against her, the anti-SLAPP motions were properly denied, and defendants' remaining contentions lack merit. In her cross-appeal, she argues the trial court abused its discretion in refusing to rule on her applications before deciding the anti-SLAPP motions.

We affirm the order denying each special motion to strike; however, we conclude the trial court abused its discretion in failing to utilize its case management tools and prevent a delay in hearing the merits of the applications for EAROs by failing to either (1) revisit the prior denial of temporary EAROs and grant temporary relief pending the resolution of defendants' anti-SLAPP motions (through appeal), or (2) decide the applications and the anti-SLAPP motions at the same time. Thus, the matter is remanded for the trial court to proceed to trial on White's applications for EAROs regarding all defendants except Wear, against whom an EARO is already in place.

# I. PROCEDURAL BACKGROUND AND FACTS[3]

## A.    *Background History of the Parties.*

Thomas is a wealthy nonagenarian, having amassed more than $40 million in various assets which were held by TW Tedesco Properties, L.P., a California limited partnership (Tedesco Properties).[4]  (*White*, *supra*, 76 Cal.App.5th at pp. 27-28.)  In 1988,

---

[3] On the court's own motion and to compile a coherent narrative, we take judicial notice of our prior opinions in:  *Conservatorship of Estate of Tedesco* (Sept. 19, 2019, E070316) [nonpub. opn.], mod. Oct. 7, 2019 (*Tedesco I*, E070316); *Tedesco v. White* (Sept. 19, 2019, E069438) [nonpub. opn.] (*Tedesco II*, E069438); *White v. Wear* (2022) 76 Cal.App.5th 24 (*White*); and Division Three's opinion in *Tedesco v. White* (June 15, 2022, G059883) [nonpub. opn.] (*Tedesco III*, G059883).  (Evid. Code, § 452, subd. (d); Cal. Rules of Court, rule 8.1115(b)(1).)  "It is well accepted that when courts take judicial notice of the existence of court documents, the legal effect of the results reached in orders and judgments may be established."  (*Linda Vista Village San Diego Homeowners Assn.*, *Inc*. *v. Tecolote Investors*, *LLC* (2015) 234 Cal.App.4th 166, 185.)

On March 4, 2022, we reserved ruling on defendants' February 14, 2022 request for judicial notice of several documents.  Defendants argued that the documents demonstrate "the systematic denial of due process rights to [defendants] and to Thomas . . . , the refusal to allow hearing on the validity of the [conservatorship], the unconstitutional denial of counsel to Thomas . . . , misrepresentations of the record in those proceedings, and [the] pending proceeding in Orange County in which . . . White is conflicted in interest with Thomas . . . ."  The court has reviewed the request for judicial notice and the opposition.  The request is denied.  None of the documents were needed to determine the issues presented in this appeal, namely whether the trial court erred in denying defendants' anti-SLAPP motions and whether the court abused its discretion in failing to utilize its case management tools and prevent a delay in hearing the merits of White's applications for EAROs.

Also, there are six separate anti-SLAPP motions and six separate oppositions thereto.  The papers involving Gloria and Wear are nearly identical, as are those involving Davis, Hertzog, Marshall, and Carpenter.  We will adopt White's approach and, for evidence common across all parties (particularly Davis, Hertzog, Marshall, and Carpenter), we will primarily cite to Marshall's motion, and opposition thereto.  When citing to evidence that pertains to Gloria and Wear, we will primarily cite to Gloria's motion, and opposition thereto.

[4] Thomas was born on April 27, 1926.  On December 31, 2005, his estate was valued at $40,474,997.  (*White*, *supra*, 76 Cal.App.5th at p. 27, fns. 1 & 2.)

4

he and his late wife created an estate plan to benefit their three daughters, White, Sandra Kay, and Julie Bas, and their grandchildren. Part of the estate plan included the creation of the living trust and W. Mae, LLC, a California limited liability company (W. Mae). (*Id.* at pp. 28-29.)

After the death of his first wife, on March 25, 2007, Thomas married Gloria (nee Basara) who had two daughters from a prior relationship, Wear (aka Debbie Basara Wear) and Wendy Basara (Wendy). Since both Thomas and Gloria entered the marriage with multimillion-dollar estates, they executed prenuptial and postnuptial agreements. (*White*, *supra*, 76 Cal.App.5th at p. 28.) There were extensive discussions regarding Thomas's residence. According to Thomas's family/estate plan attorney Burton A. Mitchell (Mitchell), the prenuptial agreement and modifications to Thomas's estate plan grant Gloria a life estate in Thomas's residence should she survive him; however, the documents do not bequeath to her fee title to his interest in the residence. (*Tedesco I*, E070316.)

On February 11, 2011, Thomas appointed his three daughters as his true and lawful attorneys to act in any lawful way for him and his name, place, and stead, and for his use and benefit as authorized. Thus, Thomas's daughters were authorized to transfer trust assets and file any necessary tax returns, and if a conservatorship was needed, they were nominated to serve, acting by majority vote. (*White*, *supra*, 76 Cal.App.5th at p. 28.) Following the creation of W. Mae (Sept. 2012), on December 26, 2012, Thomas

gifted the living trust's general partner's interest in Tedesco Properties to W. Mae.[5] (*Tedesco I*, E070316)  On or about February 20, 2013, Thomas's daughters authorized Wells Fargo Bank, N.A., to change the signer on the Tedesco Properties' account.  (*Ibid*.) On January 3, 2013, the gift documents were sent to Capitol Services for filing with the California Secretary of State; however, on March 28, 2013, Mitchell's paralegal was informed that they were rejected because the Secretary of State "now require[d] not only the signature of the new general partner, but also the signature of the former general partner."  Thus, the paralegal revised the form to add a signature block for Thomas, as former general partner, and faxed the revised form to him for signature.  Thomas signed the revised form and returned it on April 4, 2013.  The amendment to the certificate of limited partnership, which evidences the transfer of the living trust's general partner's interest in Tedesco Properties to W. Mae, was filed with the Secretary of State that same day, April 4, 2013.  (*Tedesco I*, E070316.)

After the gift documents were filed with the Secretary of State, Thomas underwent bladder surgery on April 15, 2013, and back surgery on April 30.  On June 5, 2013, Thomas resigned as trustee of the living trust, and his three daughters began to serve as successor cotrustees.  (*White*, *supra*, 76 Cal.App.5th at pp. 28-29.)  Twenty-four days later, on June 29, Thomas signed an amendment to the living trust, prepared by Mitchell, which made the living trust irrevocable and unmodifiable without the written consent of

---

[5]  Pursuant to Mitchell's letter to Thomas, dated December 12, 2012, the gift documents were signed but left undated, "so that [the law firm] could date them to be effective once everyone had signed them."  Thus, Michell's paralegal "filled in the date by hand" to read December 26, 2012, on each signature page.

Thomas and his daughters. (*Id.* at p. 29.) Thomas underwent a second bladder surgery on July 30, 2013.

During the first six years of Thomas and Gloria's marriage, no issues arose regarding Thomas's estate plan, which favored his biological heirs. However, by fall 2013, after undergoing multiple surgeries, Thomas had become intellectually impaired and susceptible to being unduly influenced. He ended his decades-long relationship with Mitchell, who stated: "'[I]t was very difficult to communicate with [(Thomas)], as Gloria seemed to be blocking the calls. When [Mitchell] called, either [Thomas] was never there or someone else was on the phone. [Mitchell] related that he heard other voices in the background, particularly Gloria, telling Thomas what to say [and Mitchell] ha[d] seen scripts written for [Thomas] regarding what he [was] to say to his attorney.'" (*White*, *supra*, 76 Cal.App.5th at p. 29.) Around the same time, "White and her sisters were denied access to their father. A housekeeper . . . confronted Gloria and said, ""You can't keep the girls from seeing their dad. They're not stupid!""" Gloria responded, 'I don't care.' Gloria told Thomas that his daughters were 'being bad' to her, blocked his communication with his family, and attempted to erase them from his memory by removing their photographs [from the residence]. Gloria prepared scripts[6] for Thomas to say to Mitchell or his daughters and caused him, for the first time, to

---

[6] Thomas was directed to tell Mitchell the following: "I have hired another law firm to represent me in regards to my conservatorship—I don't want your firm to represent me in this matter"; "[h]ave my wife own the house outright. [¶] It simplifies things. [¶] I want Gloria to own this house outright"; and "[d]isinherit my children." (*White*, *supra*, 76 Cal.App.5th at p. 29, fn. 6.)

express a desire to leave 75 percent of his estate to Gloria and 25 percent to charity." (*Ibid.*) Gloria further wanted outright ownership of Thomas's residence. (*Tedesco I*, E070316.)

### B. *The Conservatorship.*

As Thomas's memory took a "huge nose dive" in 2013, he stopped paying bills and taxes, resulting in significant penalties. On September 9, 2013, Dr. Ivor J. Nazareth, a neurologist, evaluated Thomas and reported that he had "significant cognitive impairment with a Mini Mental State Examination score of 23 out of 30."[7] The doctor opined that Thomas "is unable to make consistent and reliable rational decisions, especially when it comes to his health or handling any financial issues, even simple ones. He needs total supervision" (*Tedesco I*, E070316.) Concerned about Thomas's health and Gloria's actions, on May 2, 2014, White petitioned for the appointment of a conservator of Thomas's person, and later amended the petition to seek a conservator of his estate. On October 17, 2014, the probate court appointed Kenneth Jenkins (Jenkins) as the guardian ad litem (GAL) for Thomas with authority to investigate, retain, and discharge counsel for Thomas's protection. (*Tedesco I*, E070316.) Jenkins opposed the appointment of attorney Mary Gilstrap as Thomas's counsel on the grounds a conflict of interest existed since Gloria's attorney had recommended Gilstrap to Thomas. (*Ibid.*)

---

[7] The mini mental state examination is a 30-point test that uses a "set of questions for screening cognitive function." (See https://patient.info/doctor/mini-mental-state-examination-mmse [as of Jan. 5, 2023].)

Undeterred by White's petition for a conservatorship, Gloria and Wear continued to influence Thomas to change his estate plan by isolating him from his biological family. (*White*, *supra*, 76 Cal.App.5th at p. 29.) "Thus, on January 14, 2015, White applied for a restraining order against Wear on the [basis] that she was '"scheming to sabotage [Thomas's] relationship with his daughters, attempting to have [Thomas] amend his estate plan to favor Gloria, and trying to have [Thomas's] daughters removed as trustees of the relevant trusts."' (*Ibid*.) On January 15, 2015, a temporary restraining order (TRO) was issued "against Wear requiring her to refrain from discussing the issues of the conservatorship or Thomas's estate plan, or facilitating his access to any bank, accountant, attorney, or financial planner regarding the conservatorship or his estate plan. However, because Wear did not accept service of the TRO, service of process was not completed and, as a result, there was no hearing on the restraining order."[8] (*Id.* at pp. 29-30.)

On March 3, 2015, Jenkins was relieved from his duties as Thomas's GAL. (*Tedesco I*, E070316.) On June 15, 2015, after a contested trial, the probate court concluded a temporary conservator of Thomas's estate was necessary because Thomas

---

[8] "White also sought a restraining order against Wendy, [and o]n February 11, 2015, Wendy stipulated that she would not discuss within the presence of Thomas the conservatorship of his estate, his estate plan, or his financial affairs, and she would not take or accompany him or be present with any banker, accountant, attorney, financial planner, or any person for any reason related to his conservatorship, his estate plan, or the financial management of his affairs." (*White*, *supra*, 76 Cal.App.5th at p. 30, fn. 7.)

9

was mentally deficient and "'very susceptible to being unduly influenced.'"[9] (*White*, *supra*, 76 Cal.App.5th at p. 30.) On August 10, 2015, the parties stipulated and agreed to the appointment of David Wilson (Wilson) as permanent conservator of the estate. (*Tedesco I*, E070316.) The court also appointed independent counsel for Thomas.[10] (*Tedesco I*, E070316.) During the same time, Wear was facilitating Thomas's communications with Davis (whom she worked for as his paralegal) who repeatedly requested to be appointed Thomas's independent counsel. Each of Davis's applications

---

[9] "The court opined that the case was 'unusual' because Thomas's 'needs are adequately met by existing estate planning documents prepared by the conservatee during the period of [his] full capacity.' The court noted that Thomas's lack of capacity was attested to by his treating physician, Richard G. Byrd, M.D., and neurologist Ivor J. Nazareth, M.D., and 'clearly shown and confirmed by the very recent, credible, and compelling report of Geriatric Psychiatrist, David W. Trader, appointed by the court as [an Evidence Code section] 730 expert by stipulation of all parties.' The court further noted that the appointment of a temporary conservator was warranted as 'there is evidence from which a reasonable inference may be made that undue influence (or at least attempts at such) of [Thomas] has occurred through persons yet to be determined.' More specifically, the court noted that 'about one year ago[, on September 9, 2014,] (about the time, or soon after, this matter was commenced and after the capacity reports of Dr. Byrd and Dr. Nazareth were prepared)' Thomas, accompanied by Gloria, attempted to withdraw $500,000 from a bank account of a business entity that was no longer under his control." (*White*, *supra*, 76 Cal.App.5th at p. 30, fn. 8.)

[10] In June 2016, Thomas requested the appointment of Davis as independent counsel, but the probate court appointed Jeremy J. Ofseyer on August 4, 2016. By September 22, 2016, Ofseyer moved to withdraw as Thomas's court-appointed counsel because Gloria objected, claiming a conflict of interest based on his meeting with her many years prior. Davis filed a second request to be appointed counsel for Thomas; however, the court appointed Julia Burt on December 9, 2016. (*White*, *supra*, 76 Cal.App.5th at p. 30, fn. 9.) Because Burt was thwarted from every effort to communicate with Thomas, and Gloria accused her of having a conflict of interest, Burt moved to withdraw, and Kevin McKenzie was appointed on January 5, 2018. (*Tedesco I*, E070316.) On July 7, 2020, McKenzie moved to be relieved as Thomas's counsel; the motion was granted.

were denied by the court for the reason "that the '"history of this case reflects a crucial need that independent counsel represent [Thomas], meaning that counsel be not related with or retained by family members who may have or might be involved in influencing the conservatee and retained counsel."'" (*White*, *supra*, 76 Cal.App.5th at p. 30.)  The court further warned Davis that if he "continues to contact a person under conservatorship, it may start fitting under the elder abuse statute, and there may be injunctive relief of another type, which, if violated, would then lead to a misdemeanor on behalf of an experienced member of the bar."

C. *The Ongoing Litigation Challenging the Conservatorship.*

Despite the existence of the conservatorship and the probate court's warning, in 2017, Gloria, Wear, and Russell pursued legal action with the end goal of allowing Thomas to gain control over his estate and all financial decision-making.  They initiated civil actions that were not authorized by Wilson, sought the appointment of a GAL (Carpenter) to act on behalf of Thomas, engaged the services of Herzog, Yuhas, Ehrlich & Ardell, a PC (Herzog and Marshall's law firm),[11] and petitioned for termination of the conservatorship.  (*Tedesco I*, E070316.)  They further interfered with Thomas's relationship with Burt, his appointed counsel, causing her to move to withdraw.  (*White*, *supra*, 76 Cal.App.5th at p. 31, fn. 10.)  In support of Burt's motion, on or about July 5,

---

[11]  On June 2, 2017, Thomas signed an attorney-client agreement wherein he agreed that of the assets reclaimed, Herzog's firm would recover their costs first, then their legal fees at the following rates:  33½ percent of any recovery made before filing suit; 40 percent of any recovery made after filing suit; and 50 percent in the event of an appeal.

2017, Russell prepared and filed a declaration from Thomas wherein he declared: "I am very upset and angry that my life and liberty have been wrongfully taken from me. I worked hard all my life and have accumulated a sizeable estate. Now my daughters believe they are entitled to my estate, and they have curtailed my freedom and life in their misguided attempt to save estate taxes and to thwart my attempts to change my estate plan. My daughters have in effect imprisoned me and all I think about every day is getting rid of this conservatorship. It has robbed me of my happiness." Burt and Wilson retained the Hon. Reva G. Goetz, Judge (Ret.), to observe a meeting on September 7, 2017, between Thomas, Burt, and Wilson. According to Judge Goetz, Thomas was accompanied by Gloria, several attorneys, and a "body guard." Despite his July 5, 2017, declaration, Thomas stated that he did not know that Burt had asked to be relieved as his court-appointed counsel, he did not know the names of his privately retained attorneys, he did not remember signing an engagement letter with Herzog's firm, and his attorneys have not told him "anything" about the case.

In response to the continued attempts to interfere with court-appointed counsel's relationship with Thomas, in 2018, Wilson petitioned the probate court for, inter alia, instructions/order affirming his power to initiate and maintain litigation on Thomas's behalf and barring any counsel not appointed by the probate court (nonappointed counsel) from representing Thomas or initiating and pursuing litigation on his behalf. (*Tedesco I*, E070316.) The court granted the petition, and on September 19, 2019, we affirmed the decision. (*Tedesco I*, E070316.) In doing so, we noted that the "driving force" behind the legal actions initiated outside the conservatorship "appears to be Gloria, her

12

daughters, and nonappointed counsel (who lacked independence because they were assisted by Gloria's daughter, [Wear], paralegal to Russell). Their motivation therefore is suspect." (*Tedesco I*, E070316.)

Despite our decision in *Tedesco I*, E070316, defendants have continued to interject themselves in Thomas's affairs under the assertions that (1) he never wanted a conservatorship, (2) White and her sisters breached their fiduciary duties and fraudulently transferred Thomas's wealth to themselves, and (3) neither Wilson nor any court-appointed *independent* counsel are taking any actions to recover his misappropriated assets. (*Tedesco II*, E069438; *White*, *supra*, 76 Cal.App.5th 24.) More specifically, defendants filed suit in an Orange County court seeking to remove Thomas's daughters as cotrustees of the living trust and challenging the third amendment to that trust.[12] (*Tedesco II*, E069438; *Tedesco III*, G059883.) Also, defendants have continued to unduly influence Thomas to change his estate plan as evidenced by the creation of a purported amendment to the living trust (the 2020 purported amendment), which was signed on January 20, 2020, without notice to or approval of Wilson, the probate court, or

---

[12] The third amendment made the living trust irrevocable and not subject to alteration or amendment absent the unanimous vote of the trustor (Thomas) and the acting trustees (White, Kay & Bas). (*White*, *supra*, 76 Cal.App.5th at pp. 28-29.)

13

the living trust's trustees.**13** (*White*, *supra*, 76 Cal.App.5th at p. 31.) "The purported

amendment provides that Thomas is disinheriting his biological [family members] in

favor of Gloria and her daughters, Wear and Wendy." (*Ibid*.) On March 12, 2020, Davis

"sent a letter to Thomas's daughters and their attorney to inform them that Thomas had

changed the designated beneficiaries of the Living Trust[, such that] 75 percent of the

entire trust estate is to be distributed to Gloria upon Thomas's death, or to Gloria's

daughters if Gloria does not survive Thomas. It also provided that Carpenter and Cynthia

Finerty would serve as cotrustees." (*Id*. at p. 32.)

   D. *The Petitions for EAROs.*

   On April 27, 2020, White, as cotrustee of the living trust, filed applications for

EAROs against each defendant based on their continued efforts to unduly influence

Thomas to change his estate plan to their benefit. (*White*, *supra*, 76 Cal.App.5th at p. 31,

fn. 11.) White requested that each defendant be restrained from financially abusing

---

**13** The 2020 purported amendment, in part, provides: "'This 2020 Amendment to
the Amended and Restated Thomas S. Tedesco Living Trust is made this 20th day of
January, 2020, and executed by THOMAS S. TEDESCO as Trustor in order to make
revisions to the Thomas S. Tedesco Living Trust.

   "'On March 27, 2019, I, Thomas S. Tedesco, executed a document to revoke my
Trust in order to nullify the Third Amendment to my Trust which purportedly was
executed by me but is not in accord with my wishes. I never agreed or approved of the
Third Amendment and, if I did sign it, it was never explained to me by my attorney or my
daughters. It was signed by me at the request of one of my daughters. The Third
Amendment does not reflect my intent. Therefore, my intent was to revoke the trust in
order to have my estate be distributed in accordance with my will as amended.

   "'I have been advised that I may not have the power to revoke my Trust.
Therefore, in the event that such revocation is not allowed and, to the extent that I am
able to do so, I hereby amend my Trust in order to be sure that my wishes concerning my
estate after my death are honored.'" (*White*, *supra*, 76 Cal.App.5th at p. 31, fn. 12.)

14

Thomas, contacting him (either directly or indirectly), being within 100 yards of him, living or being in his home, and making any change, or facilitating any changes to his estate plan, including taking him to any attorney, accountant, financial planner, or banker, or by acting (or purporting to act) as his attorney or representative. On April 28, 2020, the trial court (Hon. John G. Evans) denied the applications for temporary EAROs pending a hearing on the merits. Shortly thereafter each defendant successfully challenged Judge Evans under Code of Civil Procedure section 170.6, and the matter was assigned to the Hon. Kenneth J. Fernandez.

Prior to the hearing on the EAROs, defendants (except for Wear) filed separate anti-SLAPP motions on the grounds, inter alia, the applications for EAROs arise from protected activities involving the exercise of constitutionally protected rights of petition and to freedom of speech and improperly seek to interfere and adjudicate issues raised in the Orange County Superior Court case (No. 30-2019-01078628-PR TR CJC, *In re the Thomas S. Tedesco Living Trust*).[14] White opposed each motion and urged the trial court to hear the anti-SLAPP motions together with her applications for EAROs. She argued

---

**14** On July 30, 2020, a hearing on the request for an EARO against Wear was held, and Judge Evans granted the request. Wear was ordered to (1) not abuse (financially or otherwise) or contact (directly or indirectly) Thomas; (2) not make, or facilitate, any change to Thomas's estate plan; (3) stay at least 100 yards away from Thomas; (4) move out and not return to Thomas's home in Indian Wells; and (5) not own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition. (*White*, *supra*, 76 Cal.App.5th at pp. 32-33.) We affirmed the EARO with the exception that prohibited her from owning, possessing, having, buying or trying to buy, receiving or trying to receive, or in any other way getting guns, other firearms, or ammunition. (*Id.* at p. 42.) On August 5, 2020, Wear filed her anti-SLAPP motion.

that since defendants "have repeatedly abused judicial process in service of their unlawful scheme to isolate conservatee Thomas . . . and to change his estate plan to their collective benefit," if the "EAROs issue . . . the contemporaneous denial of the anti-SLAPP motions would not stay the effectiveness of the EAROs."

The trial court chose to proceed with the hearing on the merits of the anti-SLAPP motions, explaining: "Having read the briefs, my intended ruling is that I need to rule on the anti-SLAPP motions before I begin the trial on the elder abuse restraining order applications. Depending on how I rule on the anti-SLAPP motions, that may cause an appeal to be taken to the Fourth District Court of Appeal in Riverside. And if such an appeal is taken, we'll cross that bridge when we come to it. That may result in the stay of a trial on the elder abuse restraining order petitions."

In support of their anti-SLAPP motions, defendants asserted White's applications for EAROs fell within prong one of the anti-SLAPP statute because they arose out of protected litigation activity and estate planning activities. As to the second prong, defendants claimed that (1) an "[a]ction to recover [Thomas's] assets and damages, and to restore his control in the face of elder abuse and fraud by [his] daughters, obviously does not amount to a 'wrongful taking or secreting;'" (2) White is attempting "to litigate substantive claims in an improper forum;" (3) there can be no claim of "'undue influence'" since Thomas's court-appointed counsel Kevin McKenzie approved "every action taken by [non-appointed] counsel"; (4) the conservatorship is void; (5) interference with representation by nonappointed counsel is "a *per se* violation in that it dampens advocacy and gives the court a free hand to suppress claims without a hearing;" and

16

(6) interference is precluded by the litigation privilege. In response, White argued the EARO applications do not involve constitutionally protected activity (prong one), and she (White) is likely to succeed on the merits.

On March 22, 2021, the trial court denied each anti-SLAPP motion Regarding the first prong, the court found that "[n]othing here involves a protected activity." Regarding Gloria and Wear, the court pointed out that the application was based on "the isolation of Thomas" as evidenced by Gloria providing "scripts for [Thomas] to say, block[ing] calls and isolate[ing him]. There is also evidence that she was a driving force behind the attempted recent change to [Thomas's] estate plan, benefitting her and disinheriting [his] children." The court found that Wear participated in Gloria's bad acts, particularly "isolating and unduly influencing [Thomas]," along with working with Davis, who "drafted a trust for [Thomas] in March 2020" that "heavily favors Gloria and provides that [Wear] and her sibling are contingent remainder beneficiaries."

Regarding the remaining defendants, the trial court noted that Herzog, Marshall, and Davis are nonappointed counsel, and Carpenter "alleges he is a friend of [Thomas], and has attempted in many different ways to inject himself in the litigation, either as a GAL or as a person of interest" who "was a conduit to allow non-appointed counsel to continue to file pleadings." The court recognized that evidence of their litigation activity was not itself the basis of liability, but rather was "supporting evidence of their undue influence and contributions to isolating Thomas." The court explained: "The filings are evidence of non-appointed counsels' involvement with [Thomas], even after being instructed to desist by the conservator and through various court orders. It is not the

17

filings that are the basis for the [EARO applications], but rather the filings are evidence of non-appointed counsel and Carpenter's continuing involvement in [Thomas's] isolation (from family and from appointed counsel) and undue influence."

Turning to the second prong, the trial court held "that [White] has met her burden of showing a legally sufficient claim and made a *prima facie* factual showing sufficient to sustain a favorable judgment as to all six [defendants]."[15]

## II. DISCUSSION

### A. Defendants' Appeal.

#### 1. White's standing.

Defendants complain that White has no standing to request the EAROs because she is unable to establish that she is either a trustee of the living trust or fiduciary of Thomas. We disagree.

White's "standing to sue is a threshold issue which must be resolved before this matter can be reached on its merits." (*Hernandez v. Atlantic Finance Co*. (1980) 105 Cal.App.3d 65, 71.) Pursuant to Welfare and Institutions Code section 15657.03, subdivision (a), "(1) An elder or dependent adult who has suffered abuse,[16] as defined in Section 15610.07, may seek protective orders as provided in this section. [¶] (2) *A*

---

[15] As to Wear, the EARO had been granted on July 30, 2020. (See fn. 14, *ante*.)

[16] Welfare and Institutions Code section 15610.07, subdivision (a)(3), includes "[f]inancial abuse," which occurs when a person "[t]akes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by *undue influence*, as defined in Section 15610.70." (Welf. & Inst. Code, § 15610.30, subd. (a)(3), italics added.)

18

*petition may be brought on behalf of an abused elder or dependent adult by a conservator or a trustee* of the elder or dependent adult, . . . ." (Italics added.) Here, White applied for the EAROs as a cotrustee of the living trust. (*Ibid.*) Although defendants argue to the contrary, she has been a cotrustee of the living trust since June 5, 2013. Both the lower court and this court have recognized and affirmed her position. (*White*, *supra*, 76 Cal.App.5th at p. 31; *Tedesco I*, E070316; *Tedesco II*, E069438.)

Moreover, defendants' attempt to challenge White's authority as cotrustee by initiating an action in Orange County has failed. On June 15, 2022, our colleagues in Division Three of this district affirmed the lower court's judgment dismissing defendants' petition (filed on behalf of Thomas) to remove White and her sisters as the cotrustees of the living trust and to invalidate the third amendment to that trust; the California Supreme Court denied review on October 12, 2022. (*Tedesco III*, G059883.)

Thus, White has standing to apply for EAROs on behalf of Thomas in her capacity as cotrustee of the living trust.

### 2. *Prior appellate opinions.*

Defendants contend the lower court erred in assuming the conservatorship is valid and White is a cotrustee of the living trust, and relying on this court's opinions affirming the probate court's actions. We find no error.

Defendants argue the conservatorship is void, and White and Wilson interfered in Thomas's Orange County action and prevented him from removing his daughters as cotrustees of the living trust. However, "[a]ccording to the documents attached to the first account, Wilson and counsel (law firms with expertise in trust and estate matters and

19

legal malpractice) investigated the claims asserted in the Orange County action . . . . As a result of those investigations, Wilson decided not to pursue the claims . . ." and this decision was affirmed when the probate court approved the first account. (*Tedesco II*, E069438, fn. omitted.) Wilson is an independent conservator whose actions were, and continue to be, reviewed by the probate court. All of defendants' challenges to the conservatorship have been rejected by either the probate court or the civil court. We have affirmed those decisions and the California Supreme Court has denied review of our opinions. Defendants bear the burden of demonstrating error in, or insufficient evidence in support of, the lower court's decisions; they have failed to carry their burden. Accordingly, the lower court correctly relied on this court's opinions affirming the validity of the actions of both Wilson and cotrustee White. (Cal. Rules of Court, rule 8.1115(b) ["An unpublished opinion may be cited or relied on: [¶] (1) When the court opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel . . . ."].)

        *3. Anti-SLAPP motions.*

Defendants contend the trial court erred by denying their anti-SLAPP motions. In response White asserts that Wear's anti-SLAPP motion is moot given this court's affirmance of the EARO against her, and the remaining anti-SLAPP motions were

properly denied. We conclude the court correctly denied defendants' anti-SLAPP motions.[17]

"California's anti-SLAPP statute provides: 'A cause of action against a person arising from any act of that person in furtherance of the person's [constitutional] right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines . . . there is a probability that the plaintiff will prevail on the claim.' [Citation.] This statute 'provides a procedure for weeding out, at an early stage, meritless claims arising from [specified constitutionally] protected activity.' [Citation.] The statute seeks '"to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. [Citation.] The Legislature has declared that the statute must be 'construed broadly' to that end."' [Citation.] 'The point . . . is that you have a right not to be dragged through the courts because you exercised your constitutional rights.' [Citation.]

"'Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by [Code of Civil Procedure] section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.' [Citation.] We conduct a de novo review of a trial court's order

---

[17] Arguably Wear's anti-SLAPP motion is moot; however, even if we assume that it is not, she failed to sustain her burden of showing that White's claim arises from protected activity. (See discussion, *post*.)

21

denying an anti-SLAPP motion. [Citation.] We therefore analyze the issues independent of the trial court's reasoning. [Citation.] 'If the trial court's decision is correct on any theory . . ., we affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion.'" (*Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, 876 (*Gaynor*).)

"Under the first step of the anti-SLAPP analysis, the moving party must show (1) the complaint alleges *protected speech or conduct*, and (2) the 'relief is sought based on allegations *arising from*' the protected activity. [Citations.]

"On the protected speech/conduct requirement, the statute identifies four categories of actions that are '"in furtherance of"' a defendant's free speech or petition rights: '(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.' [Citations.]

"On the 'arising from' requirement [citation], the defendant must show 'the defendant's act underlying the plaintiff's cause of action [was] *itself*' a protected act. [Citation.] '[T]he mere fact that an action was filed after protected activity took place

22

does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' [Citation.] Instead, the focus is on determining what 'the defendant's *activity* [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' [Citations.]

"In . . . clarifying these 'arising from' principles, the California Supreme Court emphasized the need for courts to determine whether the protected activity was the alleged injury-producing act that formed the basis for the claim. [Citation.] The high court explained: '"The only means specified in [Code of Civil Procedure] section 425.16 by which a moving defendant can satisfy the ['arising from'] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e) . . . ."' [Citation.] The [California Supreme C]ourt thus instructed that 'in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] In so doing, the courts should be 'attuned to and . . . respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity *or provide evidentiary support for the claim*.'" (*Gaynor*, *supra*, 19 Cal.App.5th at pp. 877-878.)

Here, White applied for EAROs against defendants, claiming that they participated in actions that did, and continue to, unduly influence Thomas to change his estate plan for their benefit. To support her applications she was required to establish that Thomas has suffered, or continues to suffer, past acts of abuse. "'Abuse of an elder'" is defined as

23

"(1) Physical abuse, neglect, abandonment, isolation, abduction, or *other treatment with resulting* physical harm or pain or *mental suffering*. [¶] . . . [¶] (3) Financial abuse, as defined in Section 15610.30." (Welf. & Inst. Code, § 15610.07, subd. (a)(1), (3), italics added.) "'Financial abuse'" occurs when a person or entity "[t]akes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by *undue influence*, as defined in Section 15610.70." (Welf. & Inst. Code, § 15610.30, subd. (a)(3), italics added.) "'Undue influence,'" a form of elder financial abuse, is defined as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a).) In determining whether undue influence was used, the statute directs a court to consider four factors: (1) the vulnerability of the victim; (2) the influencer's apparent authority, i.e., a fiduciary or family relationship; (3) the influencer's actions or tactics, i.e., controlling the victim's life, interactions with others, using affection, or initiating changes in personal or property rights, particularly via haste or secrecy; and (4) the equity of the result, i.e., any divergence from the victim's prior intent or course of conduct or dealing, and "the appropriateness of the change in light of the length and nature of the relationship." (Welf. & Inst. Code, § 15610.70, subd. (a)(1)-(4).)

White identified several examples of actions taken by defendants that have resulted in agitating and confusing Thomas, causing him emotional distress such that he cooperates with Gloria and Wear and changes his decades-long estate plan to their benefit. She specifically points out that in 2020, defendants influenced Thomas to

24

execute a purported amendment to the living trust, which disinherits his biological family members in favor of Gloria and her daughters, and appoints Carpenter and Cynthia Finerty as cotrustees in place of White and her sisters. Thus, White contends that it is defendants' acts of isolating, agitating, and confusing Thomas to effectuate a change in his estate plan that give rise to the EAROs, not defendants' protected free speech or petitioning activity. We agree. (*Gaynor*, *supra*, 19 Cal.App.5th at pp. 880-881.)

In *Gaynor*, the beneficiaries of a family trust sued a de facto trustee (defendant) and other trustees for attempting to unfairly distribute trust funds. (*Gaynor*, *supra*, 19 Cal.App.5th at p. 869.) According to the beneficiaries, the defendant and other trustees breached their fiduciary duties by implementing a plan to benefit one class of beneficiaries over another, and by wrongfully withdrawing trust assets to initiate and defend probate petitions to convince the probate court to adopt their plan. (*Id*. at pp. 873-874.) In response, the defendant filed an anti-SLAPP motion, contending the beneficiaries' claim arose out of the filing of probate litigation. (*Id*. at p. 875.) The trial court denied the motion to strike, and the Court of Appeal affirmed (*id*. at pp. 875-876, 888), concluding the beneficiaries' claims "were predicated on [the defendant] taking actions to favor himself to the detriment of the [trust] beneficiaries" (*id*. at p. 879).

Although the beneficiaries' complaint included allegations regarding the improper use of probate litigation, the Court of Appeal concluded those allegations "merely reflected the manner in which the [other trustees and the defendant] implemented their alleged wrongful plan to alter the trustee succession rules to favor their own interests." (*Gaynor*, *supra*, 19 Cal.App.5th at p. 879.) While recognizing that the legal filings were

protected activities, the Court of Appeal explained that "[a]lthough the alleged breach of loyalty may have been carried out by the filing of probate petitions, it was not the petitioning activity itself that is the basis for the breach of fiduciary claim." (*Id.* at p. 880.) Thus, while the "litigation activities . . . would provide *evidence* of the alleged breaches of fiduciary duty, . . . the filing of these petitions was not necessary to establish this portion of the breach of fiduciary duty claim." (*Ibid.*)

The analysis applied in *Gaynor* equally applies here. White's allegations against defendants are predicated on Gloria and Wear's actions to (1) isolate Thomas, (2) control the individuals who have access to him (including his biological family members, people who had worked for him for a number of years in his home, and prior attorneys), and (3) influence his understanding of and opinions concerning the conservatorship and his estate plan to support nonappointed counsel and Carpenter procuring an amendment[18] to the living trust independent of the conservatorship and the probate court. The purpose of these actions is to unlawfully alter Thomas's decades-long estate plan in favor of

---

[18] Estate planning does not constitute protected activity for purposes of the anti-SLAPP statute. (*Moore v. Shaw* (2004) 116 Cal.App.4th 182, 197 [claim based on an allegation that an attorney "intentionally or negligently participated in a breach of trust by drafting [a] termination agreement . . . which enabled [the trustee] to terminate the . . . Trust prematurely, to the detriment of . . . contingent beneficiaries" does not fall within the anti-SLAPP statute]; contra, *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479, 483 [Although the Court of Appeal found that the claim based on the attorneys' "actions in revising [the] estate plan, attempting to implement the revised plan through probate proceedings, and defending the . . . family respondents in litigation initiated by" plaintiff arises from petitioning activity, it noted that the will revision was protected activity under the anti-SLAPP statute "only insofar as it was later implemented through the probate proceedings." Alternatively, "it was only incidental to the subsequent protected activity, thus rending [the] entire cause of action subject to a special motion to strike."].)

26

defendants and to the detriment of Thomas's biological family members. While defendants' various litigation activities are protected petitioning activities under the anti-SLAPP statute, their plans to unduly influence Thomas and change his estate plan are not. As in *Gaynor*, defendants' litigation activities merely evidence their nefarious actions to control Thomas through isolation, confusion, and mental suffering designed to overcome his free will.[19]

In sum, White's applications for EAROs do not arise out of defendants' protected activity, but out of their actions to unduly influence Thomas regarding his decades-long estate plan. Having failed to meet their burden with respect to the first step of the anti-SLAPP analysis, we need not consider defendants' arguments that White failed to establish a probability of prevailing on the merits.

### 4. *Thomas's right to independent counsel.*

Defendants contend that their assistance in asserting Thomas's civil and testamentary rights cannot be restrained by EAROs to prevent them from seeking a judicial determination that will resolve the very issue raised by the EAROs. In support of this contention, they argue that (1) the recent amendment to Probate Code section 1471 (Stats. 2021, ch. 417, § 6, eff. Jan. 1, 2022)—which empowers them to act as Thomas's independent counsel—overrules this court's opinion in *Tedesco I*, E070316; (2) there is

---

[19] As the trial court observed, "The filings are evidence of non-appointed counsel's involvement with [Thomas], even after being instructed to desist by the conservator and through various court orders. It is not the filings that are the basis for the applications."

insufficient evidence of "'undue influence'"; and (3) White failed to show that defendants "acted with no objectively reasonable basis." We disagree.

The recent amendment to section 1471 allows for the appointment of counsel of choice in specific circumstances and upon the condition that counsel is free of any conflict of interest. Upon Thomas's request, the probate court shall appoint private counsel to represent him in the following proceedings: "(a)(1) A proceeding to establish or transfer a conservatorship or to appoint a proposed conservator. [¶] (2) A proceeding to terminate the conservatorship. [¶] (3) A proceeding to remove the conservator. [¶] (4) A proceeding for a court order affecting the legal capacity of the conservatee. [¶] (5) A proceeding to obtain an order authorizing removal of a temporary conservatee from the temporary conservatee's place of residence." (Welf. & Inst. Code, § 1471, subd. (a)(1)-(5).) If Thomas "expresses a preference for a particular attorney to represent [him], the court shall allow representation by the preferred attorney, even if the attorney is not on the court's list of a court-appointed attorneys, and the attorney shall provide zealous representation as provided in subdivision (e). However, *an attorney* who cannot provide zealous advocacy or *who has any conflict of interest with respect to the representation of the conservatee*, proposed conservatee, or person alleged to lack legal capacity *shall be disqualified.*" (*Id*., subd. (d), italics added.)

After reviewing the noted amendment to section 1471, we conclude that nothing in the amended version overrules this court's opinion in *Tedesco I*, E070316. The appointment of private counsel is limited to five proceedings, none of which apply to the instant situation. (Welf. & Inst. Code, § 1471, subd. (a)(1)-(5).) Even if the instant

28

situation qualified as an enumerated proceeding authorizing the appointment of private counsel, defendants would still have to overcome the hurdle of rebutting a claim of conflict of interest. (*Id*., subd. (d).) In the past Davis's requests to be appointed Thomas's independent counsel were denied by the probate court because the ""history of this case reflects a crucial need that independent counsel . . . be not related with or retained by family members who may have or might be involved in influencing the conservatee and retained counsel."" (*White*, *supra*, 76 Cal.App.5th at p. 30.) The court even warned Davis that if he "continues to contact a person under conservatorship, it may start fitting under the elder abuse statute, and there may be injunctive relief of another type, which, if violated, would then lead to a misdemeanor on behalf of an experienced member of the bar." Nonetheless, Davis contacted Herzog and introduced him to Thomas.

Contrary to defendants' claims, we conclude there is substantial evidence of "'undue influence.'" (*White*, *supra*, 76 Cal.App.5th at pp. 40-42; see *Tedesco I*, E070316.) Moreover, given this evidence, particularly the repeated orders of the Riverside courts, the Orange County court, and the appellate opinions of both this court and Division Three of this district, defendants are hard-pressed to claim that they acted with any "objectively reasonable basis." (See *White*, *supra*, 76 Cal.App.5th at p. 42; *Tedesco I*, E070316; *Tedesco II*, E069438; and *Tedesco III*, G059883.)

5. *Exclusive subject matter jurisdiction of Orange County.*

Defendants contend the EAROs must be stricken because they interfere with Orange County's exclusive subject matter jurisdiction. This issue is moot since the

29

Orange County court rejected defendants' attempt to challenge White's authority as cotrustee, and its decision was affirmed on appeal. (*Tedesco III*, G059883.) The appellate court noted that "[t]he conservatorship *provides* [Thomas] with representation, in the form of a duly appointed conservator who has a fiduciary obligation to act in [Thomas's] best interest, and who is subject to probate court oversight to ensure he acts appropriately. To the extent the conservatorship erects a barrier to [Thomas's] representation, it is a barrier designed to shield him from the undue influence of those whose interests do not align with his." (*Tedesco III*, G059883.)

### 6. *Joinder*

Finally, defendants contend the trial court erred in proceeding without joinder by Thomas. We disagree. The application for an EARO may be brought on behalf of the abused elder or dependent adult by a conservator or a trustee. (Welf. & Inst. Code, § 15657.03, subd. (a)(2).) As a conservatee, Thomas lacks the legal capacity to pursue litigation in his own name. (Prob. Code, §§ 1872, subd. (a) ["the appointment of a conservator of the estate is an adjudication that the conservatee lacks the legal capacity to enter into or make any transaction that binds or obligates the conservatorship estate."]; 2462, subd. (a) [The conservator may "[c]ommence and maintain actions and proceedings for the benefit of the ward or conservatee or the estate."].) Here, Wilson filed a limited joinder to White's applications; therefore, Thomas's interests are represented. And Thomas's absence from the litigation does not preclude the superior court from rendering the complete relief sought. (Code Civ. Proc., § 389 ["(a) A person who is subject to service of process and whose joinder will not deprive the court of

jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."].)

### B. White's Cross-appeal.

In her cross-appeal, White challenges the trial court's decision to rule on defendants' anti-SLAPP motions before her applications for EAROs. The decision about when to hear an anti-SLAPP motion, like all rulings implicating how a court manages its courtroom calendar and docket, is reviewed for abuse of discretion. (*Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 916 fn. 6; see *Platypus Wear*, *Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 782 [reviewing ruling on application to file late anti-SLAPP motion for abuse of discretion].) Thus, White contends the court abused its discretion in prioritizing the anti-SLAPP motions over the EARO applications. (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635 (*Thomas*).) We agree.

In *Thomas*, a plaintiff sought injunctive relief against a defendant who was harassing members of the plaintiff's congregation "'with the stated purpose of causing [him to suffer] extreme embarrassment and severe emotional distress.'" (*Thomas*, *supra*, 126 Cal.App.4th at p. 642.) The trial court issued an order to show cause and set a hearing to determine if an injunction should issue. (*Id*. at p. 643.) Meanwhile, the court

31

granted a TRO that ordered defendant, inter alia, to stay at least 100 yards away from plaintiff, his family members, and the pastor and members of plaintiff's church. (*Ibid.*) On the day of the hearing, the court granted defendant's request for a continuance, and defendant immediately filed an anti-SLAPP motion. (*Ibid.*) The court denied the motion, holding that the anti-SLAPP statute does not apply to civil harassment petitions. (*Id.* at p. 648.) The Court of Appeal reversed. (*Id.* at p. 665.) Acknowledging "the potential for conflict between the anti-SLAPP statute and the civil harassment remedy," the Court of Appeal rejected the concern that "allowing a petition for civil harassment to be attacked by a special motion to strike will interfere with the civil harassment statutory scheme" and held that the anti-SLAPP statute applies in such cases. (*Id.* at pp. 648-649.) The appellate court reasoned that "any threat to the efficacy of the civil harassment proceeding, should it arise, can be eliminated by the trial court's use of well-known case management tools." (*Id.* at p. 649.)

According to White, *Thomas* "makes clear that the trial court had discretion to use its case management tools to avoid the result here:  interference in elder abuse restraining order proceedings by an anti-SLAPP motion." We concur; however, it failed to do so. Initially, the court (Judge Evans) declined to grant temporary EAROs on the grounds "[d]ue process requires a hearing." Subsequently, the court (Judge Fernandez) decided to hear the anti-SLAPP motions prior to the EARO applications. Although the court entered an order denying each anti-SLAPP motion, defendants' appeal of the order resulted in automatically staying any further hearing on the applications. (Code of Civ. Proc., § 916, subd. (a); *Varian Medical Systems*, *Inc. v. Delfino* (2005) 35 Cal.4th 180, 189 [Subject to

certain exceptions, "'the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby.'"].)  Thus, defendants' anti-SLAPP motions have interfered with White's EARO proceedings because the trial court never issued temporary EAROs to protect Thomas.

Given the nature of the relief sought—protection from financial abuse of a dependent adult—we conclude that the trial court abused its discretion in failing to utilize its case management tools and prevent a delay in hearing the merits of the EARO applications.  It could have either (1) revisited the prior denial of temporary EAROs and granted such temporary relief pending resolution of defendants' anti-SLAPP motions (through appeal), or (2) decided the applications and the anti-SLAPP motions at the same time.

## III.  DISPOSITION

The order denying defendants' anti-SLAPP motions is affirmed.  The matter is remanded to the trial court to proceed to trial on White's applications for EAROs regarding all defendants except Wear, against whom an EARO is already in place.  White is awarded costs on appeal.

CERTIFIED FOR PUBLICATION

McKINSTER_____
                                                                                                                    J.

We concur:

RAMIREZ_____
                        P. J.

SLOUGH_____
                        J.

33