Filed 6/24/24  Foroughi v. Creighton CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JACLYN FOROUGHI,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LINDA CREIGHTON et al.,<br><br>    Defendants and Appellants. | A165574<br><br><br>(San Mateo County<br>Super. Ct. No. 21CIV01197) |

This is an appeal from an order partially denying the special motions to strike under the anti-SLAPP statute (Code Civ. Proc., § 425.16)[1] filed by nine defendants.[2]  The underlying dispute involves executive board members of a

---

[1] Unless otherwise stated, all statutory citations herein are to the Code of Civil Procedure.

[2] Defendants are Linda Creighton, James Loftus, Cassandra Lopez Loftus, Patty Lopez-Jaramillo, Anjali Patel, Ashlee Rea, Krista Rosa, Julianna Johnson, and Stephanie Connors.  The trial court identified Creighton as the principal defendant and the others as the individual defendants.  The parties have followed this methodology on appeal, as do we for purposes of this opinion.  Accordingly, all defendants are collectively referred to as "defendants," Creighton is referred to as "defendant Creighton," and the remaining eight individuals are collectively referred to as "individual defendants."

Defendant Creighton filed one set of appellate briefs, and the individual defendants filed another set while joining all arguments raised in defendant Creighton's briefs.

1

nonprofit parent teacher organization at a public elementary school serving the Menlo Park–Atherton community.  Plaintiff Jaclyn Foroughi, the organization's former financial secretary and treasurer, brought a derivative action on behalf of the organization for breach of fiduciary duty by defendants, who served as officers and directors on the executive board during the 2019–2020 school year.

The trial court issued the challenged order after finding defendants failed to prove much of the conduct forming the basis of plaintiff's claims arises from constitutionally protected activity.  Defendants challenge this finding on appeal.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Laurel School Parent Teacher Organization (PTO) is composed of a group of volunteer members tasked with supporting the education and welfare of the students of Laurel School (School) and facilitating communication and cooperation among parents, teachers, administrators, and the community.  The PTO accomplishes this task by, among other things, engaging in school fundraising on its own and in cooperation with the Menlo Park–Atherton Education Foundation (MPAEF).  The MPAEF, in turn, supports the Menlo Park City School District (District) to provide quality education not just to the Laurel School but also to the Encinal, Oak Knoll and Hillview schools.

Plaintiff is the parent of three children who attend or attended the School.  In addition, plaintiff has served on the PTO as an executive board member, acting as financial secretary from April 11 to July 31, 2019, and as cotreasurer from August 1 to December 12, 2019  Plaintiff has over 20 years of professional experience in finance and accounting, 10 years in nonprofit

management, and eight years in academia. She resigned from the PTO's executive board on December 12, 2019, but remains a PTO member.

Individual defendants served with plaintiff as officers and directors on the PTO's executive board during the 2019–2020 school year. Defendant Creighton also served on this executive board in her capacity as the School's principal.

## I. *The Lawsuit.*

In March 2021, plaintiff brought this derivative lawsuit on behalf of the PTO[3] against the individual defendants asserting one cause of action for breach of fiduciary duty. The operative amended complaint was filed on June 28, 2021. This complaint identifies various alleged breaches of fiduciary duty involving defendants' failure to act in the face of a known duty to act, failure to investigate and disclose known illegality and misconduct, and covering up known misconduct. Relevant to this appeal, these alleged breaches arise from four activities in which the PTO was involved during the 2019–2020 school year, which have been identified by the trial court and the parties as follows: (1) ultra vires fundraising, (2) illegal quid pro quo (mislabeling donations), (3) flip-flopping or failing to insist on key provisions in negotiating a memorandum of understanding (MOU) with the District, and (4) covering up or failing to properly investigate members' complaints of bullying and intimidation.

### A. Ultra Vires Fundraising.

According to the amended complaint, the PTO engaged in fundraising that exceeded its authority under the PTO's corporate charter by participating in the One Community Campaign (OCC). The OCC was created

---

[3] The complaint identifies the PTO as a nominal defendant in its derivative capacity.

by the District and the MPAEF to facilitate a "single donation ask" for the parent teacher organizations of local elementary schools and the MPAEF. However, plaintiff alleges that when the OCC was created, the PTO became a fundraising entity for the benefit of the District rather than for the School. This violated the PTO's articles of incorporation, which state that the PTO's "specific purpose" is to "promote and support the education and welfare of the students at Laurel School and to facilitate communication and encourage cooperation among parents, teachers, administrators, the Board of Education and the community."

After looking into the OCC, plaintiff allegedly alerted defendants that the PTO did not have authority to participate and recommended amending the PTO's charter to avoid jeopardizing the organization's tax-exempt status. However, defendants "flatly refused to do so" and continued the practice. According to the amended complaint, defendants' conduct constitutes a failure to act in the face of a known duty to act and an intentional violation of applicable law.

### B. Illegal Quid Pro Quo: Mislabeling Donations.

The amended complaint further alleges defendants engaged in an "illegal quid pro quo" by collecting fees from School parents for the purpose of sponsoring overnight field trips, some of which were matched by corporate sponsors, and labeling these fees as donations. Plaintiff learned of this practice just weeks after becoming the PTO's treasurer, when defendant Creighton forwarded her an email from a parent inquiring about the "trick for Outdoor Ed as we did last year for Coloma where we would not pay but contribute a donation instead that would be matched by Apple and could sponsor 2 scholarships." Because these fees were not, in fact, tax-deductible donations, plaintiff advised defendant Creighton that mislabeling them as

4

donations was an unlawful "quid pro quo scheme" that could "jeopardize the PTO's tax exempt standing." Creighton responded: " 'Don't worry about it because the amount is so small and detailed, [plaintiff] is the first person to call attention to it, and we'll let the donors worry about it if they get audited.' " Plaintiff later learned defendant Johnson, the previous PTO treasurer, also warned Creighton the practice was illegal, yet it continued.

According to the amended complaint, while the PTO's executive board set up a subcommittee to investigate this practice, "the Individual defendants breached their fiduciary duties by populating the Subcommittees with themselves and others who were not independent."[4]

### C.     MOU Negotiations: Flip-flopping on the Ask Amount Per Student and Not Insisting on a Key Provision.

Plaintiff alleges defendants' participation in the OCC led to other breaches of their fiduciary obligations. The OCC, as originally proposed by the District, asked each family to donate $2,000, with the first $250 going to the family's parent teacher organization and the remainder to the MPAEF. The District also proposed adding a line item of $50,000 to each school budget to fund field trips and special productions and if the OCC resulted in any additional monies, sharing it equally with the parent teacher organizations. However, when the District drafted and circulated an MOU for the OCC, it omitted language regarding the sharing of additional monies. Nonetheless, defendant Loftus, who negotiated the MOU for the PTO, allegedly failed to insist on this key provision or conduct adequate due diligence regarding whether $250 per student was sufficient.

---

[4] Plaintiff concedes the PTO eventually consulted a tax attorney to look into the matter and then followed the attorney's advice to return all "donations" to the donor families and corporations and to discontinue the practice.

According to the amended complaint, plaintiff and the PTO's copresident, Kelly Parisi, told defendants the PTO needed to negotiate a higher "ask" amount per student in order to meet its budget. Initially, individual defendants including Loftus agreed the PTO should negotiate with the District for $300 per student. However, defendants Loftus, Lopez-Loftus, Patel, Rosa and Connors allegedly succumbed to pressure from defendant Creighton and agreed to support the original $250 ask per student even though the "evidence and support for . . . $300 per student was overwhelming."[5] Further, the MOU was approved and signed with the $250 ask per student and without the District's promise to share any additional OCC monies—to wit, another alleged breach of defendants' fiduciary duties.

### D. Covering Up/Refusing to Properly Investigate Complaints of Bullying and Intimidation.

Lastly, the amended complaint alleges that when plaintiff and other PTO members voiced their concerns to defendant Creighton and other individual defendants regarding the aforementioned improper fundraising activities, defendants bullied and intimidated them and then orchestrated a cover-up of their conduct. Among other things, plaintiff alleges defendants failed to appoint an outside, or independent, third party to investigate the bullying and intimidation complaints and, instead, conducted a biased and incomplete internal investigation despite their own involvement.

## II. *Anti-SLAPP Motions.*

On June 1, 2021, defendant Creighton filed a motion under the anti-SLAPP statute to strike all or part of the amended complaint. On June 28, 2021, individual defendants did the same. Defendants argued that

---

[5] Plaintiff also alleges three individual defendants—Connors, Rosa and Lopez-Jaramillo—were also board members of the MPAEF, which created a conflict of interest in their work for the PTO.

all or some of plaintiff's claims are protected speech or conduct under the anti-SLAPP statute and that they lack minimal merit. Their separate motions were subsequently joined by the court.

In opposition to these motions, plaintiff argued her lawsuit is not subject to the anti-SLAPP statute because it is brought solely in the public interest. Consequently, plaintiff argued the court need not address whether defendants' conduct constitutes protected activity or whether she can prove a likelihood of success on the merits.

## III. *The Court's Order and Notice of Appeal.*

On June 2, 2022, the trial court issued an order partially granting and partially denying defendants' anti-SLAPP motions. Initially, the court rejected plaintiff's argument pursuant to section 425.17 that the anti-SLAPP statute does not apply to her lawsuit because it is brought solely in the public interest. While the court acknowledged a public interest component of the lawsuit, it also found that plaintiff sought relief that benefitted herself and not just the PTO and broader School community. In particular, the court noted the request for injunctive relief "is, at least in part, personal to Plaintiff" in that it appears to ask for an order requiring defendants to retract certain statements that allegedly defamed her.

The trial court also found defendants failed to prove that plaintiff's claims relating to the (1) ultra vires fundraising, (2) illegal quid pro quo (mislabeled donations), (3) MOU "ask" activity, and (4) whether covering up or failing to properly investigate complaints of bullying and intimidation constitute protected speech or conduct under the anti-SLAPP statute. In so finding, the court noted that individual defendants failed to identify any particular portion of the amended complaint that they were seeking to strike. Nonetheless, the court assumed for purposes of its order that individual

defendants were seeking to strike the same claims and paragraphs as defendant Creighton.

Finally, the trial court found defendants proved plaintiff's claims relating to falsifying board minutes and subcommittee reports and verbal abuse of plaintiff and a colleague during a board meeting constitutes protected speech or conduct under the anti-SLAPP statute. The burden thus shifted to plaintiff to prove these claims had at least minimal merit. Because plaintiff failed this burden, the court struck the allegations in the amended complaint relating to these claims.[6]

Only defendants timely appealed the court's order.[7]

## DISCUSSION

California's anti-SLAPP statute authorizes a defendant to move to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) The purpose of this statute is to "encourage participation in matters of public significance by allowing defendants to request 'early judicial screening' of claims targeting free speech or petitioning activities. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880 [citations]; see § 425.16, subd. (a).)" (*Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 311 (*Wittenberg*).)

---

[6] Specifically, the court struck paragraphs 91 (as to individual defendants Lopez Loftus, Rosa, Patel and Connors only), 107–108, 125, 144, 150, and 159 of the amended complaint.

[7] In the respondent's brief, plaintiff contends the trial court erred by (1) finding her lawsuit was not brought solely in the public interest and (2) striking certain paragraphs of the amended complaint. Plaintiff asks that we reverse these rulings. Because the timely filing of an appropriate notice of appeal is an "absolute prerequisite" to the exercise of appellate jurisdiction, we decline her request. (*Garg v. Garg* (2022) 82 Cal.App.5th 1036, 1041.)

8

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16, and if the defendant makes this showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. [Citation.] On appeal, we review the trial court's ruling on the anti-SLAPP motion de novo." (*Wittenberg, supra,* 50 Cal.App.5th at pp. 311–312.)

A "claim arises from protected activity when that activity underlies or forms the basis for the claim. . . . [T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' [Citation.] 'The only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e) . . . .' ([Citation], italics added.) In short, in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063 (*Park*).)

"Analysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite

9

degree of merit to survive the motion." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).)

In this case, all of plaintiff's claims are for breach of fiduciary duty, which requires her to prove: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 646.) As categorized by the parties and the trial court, plaintiff's claims are based on defendants' acts of (1) ultra vires fundraising through the PTO's participation in the OCC, (2) mislabeling fees as donations, (3) failing to make certain "asks" of the District in negotiating the MOU for the OCC, and (4) covering up or failing to properly investigate complaints of bullying and intimidation (p. 3, *ante*).

Defendants contend these claims fall within two categories of protected acts under section 425.16, subdivision (e), mainly, "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3)–(4).)[8] The latter provision, section 425.16, subdivision (e)(4), is known as the "catchall" provision, and requires the court to engage in a two-step inquiry to decide whether the activity from which a claim arises is entitled to protection: "[F]irst, we ask what public issue or issues the challenged activity implicates, and second, we

---

[8] Under section 425.16, subdivision (e), which is not implicated in this case, protected acts also include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, [and] (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law . . . ."

ask whether the challenged activity contributes to public discussion of any such issue. [Citation.] If the answer to the second question is yes, then the protections of the anti-SLAPP statute are triggered, and the plaintiff in the underlying lawsuit must establish 'a probability' of prevailing before the action may proceed. (§ 425.16, subd. (b).)" (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1243 (*Geiser*).)

**I.** ***Plaintiff's claims are not based on a statement or writing made in a public forum in connection with an issue of public interest (§ 425.16, subd. (e)(3)).***

Defendants contend plaintiff's claims arise from their statements and conduct as PTO directors and officers that were made in a public forum in connection with issues of public interest. According to defendants, their fundraising activities cannot be separated from their communications seeking donations from the public for this fundraising because they are "one and the same." We disagree. Several cases illustrate why.

In *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, a fire protection district sued a county retirement board over the pension contribution levels decided upon by the board. In its an anti-SLAPP motion, the board argued the lawsuit arose out of its deliberations and vote, held in a public forum, that led to its pension decision. The reviewing court disagreed: "The fact that a complaint alleges that a public entity's action was taken as a result of a majority vote of its constituent members does not mean that the litigation challenging that action *arose from* protected activity, where the measure itself is not an exercise of free speech or petition. Acts of governance mandated by law, without more, are not exercises of free speech or petition." (*Id.* at p. 354; accord, *Graffiti Protective Coatings Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1214–1215, 1224 [rejecting anti-SLAPP

11

challenge where the company's lawsuit was based on the city's alleged violation of competitive bidding laws in awarding a contract to the company's rival and not on the city's communications that preceded its decision].)

Similarly, in *Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, the beneficiaries of a family trust sued a de facto trustee (defendant) and individual trustees for breach of fiduciary duty. As here, the *Gaynor* complaint identified many separate incidents of wrongdoing, including implementing a plan to benefit one class of beneficiaries over another and wrongfully withdrawing trust assets to engage in litigation to convince the probate court to adopt their plan. (*Id*. at pp. 873–874.) The defendant filed an anti-SLAPP motion, contending the beneficiaries' claim arose out of protected activity, such as filing probate lawsuits. (*Id*. at p. 875.) The trial court denied this motion, and the appellate court affirmed, explaining the beneficiaries' breach of fiduciary duty claim was based on defendant's violations of statutes governing a trustee's handling of trust assets, not his filing of litigation. Although plaintiff's petition included allegations that defendant engaged in protected activities, these allegations provided evidence to support the claim for breach of fiduciary duty but were not "an essential element of the claim." (*Id*. at pp. 870, 882.)

Lastly, in *Park, supra*, 2 Cal.5th at page 1063, an associate professor of Korean descent sued his employer, a public university, for national origin discrimination after being denied tenure while less qualified Caucasian faculty members were granted tenure. The university filed an anti-SLAPP motion, arguing, similar to here, that all aspects of its tenure process, including its ultimate decision, were inextricably intertwined protected activity conducted in a public forum. (*Id*. at pp. 1069–1070.) Our state's high court disagreed, holding the plaintiff's claims were based on the act of

12

denying tenure on discriminatory grounds and not on "the grievance proceeding, any statements, or any specific evaluations of him in the tenure process." (*Ibid.*) "The tenure decision may have been communicated orally or in writing, but that communication does not convert Park's suit to one arising from such speech. The dean's alleged comments may supply evidence of animus, but that does not convert the statements themselves into the basis for liability." (*Id.* at p. 1068.) The anti-SLAPP motion thus failed.

Based on this case law, we conclude the claims against defendants in this case arise from their alleged breaches of fiduciary obligations owed to the PTO, not from any speech activity, which is merely incidental to their nonspeech activity. As in *Park*, *San Ramon Valley* and *Gaynor*, defendants' allegedly improper activities (such as their illegal fundraising and failure to properly handle complaints of bullying and intimidation) are distinct from their speech-related activities (such as drafting PTO reports and meeting minutes, making statements at public meetings, and casting votes). Although this protected speech, alleged in the amended complaint, is part of "the 'evidentiary landscape' within which the action arose, the claims are ultimately based on the allegation that [defendants] engaged in conduct inconsistent with the fiduciary obligations [they] owed to [plaintiff]." (*Castleman v. Sagasar* (2013) 216 Cal.App.4th 481, 494; cf. *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 427 (*City of Montebello*) [elected officials may assert the protection of § 425.16 when sued over "how they voted"]; *Lee v. Silveira* (2016) 6 Cal.App.5th 527, 543 ["it is clear from the substance of plaintiffs' . . . claim that director defendants' acts in voting were not merely incidental to the allegations of wrongful conduct"; rather, "plaintiffs allege director defendants engaged in in such wrongful conduct as a result of *how* they voted in board meetings on public issues affecting FVHOA members"].)

13

Accordingly, section 425.16, subdivision (e)(3) does not protect defendants from having to defend plaintiff's claims.

## II. *The claims are not based on conduct in furtherance of the exercise of free speech in connection with a public issue or issue of public interest (§ 425.16, subd. (e)(4)).*

We are left with the anti-SLAPP statute's catchall provision, section 425.16, subdivision (e)(4). According to defendants, plaintiff's claims arise from statements they made and conduct in which they engaged in furtherance of their free speech rights in connection with a public issue. Defendants reason that their fundraising efforts are "of great interest to the hundreds of families whose children attend the Laurel School and to the members of the Menlo Park–Atherton community at large" and that "even private conversations regarding issues of public interest warrant anti-SLAPP protection." Not so.

As *Park* aptly explained, "the assertion the University's hiring decision is a matter of public interest does not suffice to bring that decision within the scope of protected activity defined by section 425.16, subdivision (e)(4)." (*Park, supra*, 2 Cal.5th. at p. 1072.) As such, even assuming decisions taken by defendants on the PTO's behalf are matters of public interest, this fact alone does not suffice to bring their allegedly unlawful decisions, taken in violation of their fiduciary obligations, within section 425.16's protective ambit. (*Park*, at p. 1072; *Geiser, supra*, 13 Cal.5th at p. 1243 [anti-SLAPP protections only triggered if the challenged activity implicates a public issue *and* the challenged activity contributes to public discussion of any such issue].)

*Bonni* is illustrative. There, the defendants included both hospital-affiliated entities and eight individual doctors. Similar to here, the defendants argued broadly that their allegedly improper decisions, which

14

included suspending a physician and failing to renew his privileges, "further[ed] their speech and petitioning on 'an identifiable matter of public interest: patient safety.' " (*Bonni, supra*, 11 Cal.5th at pp. 1007, 1021.) The court disagreed: "At bottom, disciplining a doctor based on the view that the doctor's skills are deficient is not the same thing as making a public statement to that effect. The latter is, or may be, speech on a matter of public concern. The former is not speech at all. [Citation.] Treating disciplinary acts indistinguishably from speech—such that if stating a given viewpoint would warrant constitutional and anti-SLAPP protection as an exercise of free speech rights, the same protection should extend equally to any actions motivated by that viewpoint—assumes, at root, that conduct generally is tantamount to speech. But expression and nonexpressive acts do not have equal stature in First Amendment law. An employer has the constitutional right to express opposition to antiretaliation laws, for example, but the employer has no equivalent right to fire an employee in retaliation for whistleblowing activity. . . . [And], as we have elsewhere made clear, even if the statute shields statements about an individual's qualifications, the Legislature did not necessarily also intend to shield all actions motivated by those views." (*Id*. at pp. 1021–1022.)

Ultimately, the *Bonni* court concluded the inquiry under section 425.16, subdivision (e)(4) turns on whether "the [defendants'] conduct advances [their] '*ability* to speak [or petition] on matters of public concern.' [Citation.]" (*Bonni, supra*, 11 Cal.5th at p. 1022.) There, "it is true that the suspensions of [the physician] were a 'but for' cause of those protected acts—no suspension, no proceedings or reports. But that sort of causal link does not mean the suspensions advanced the Hospitals' ability to speak or to petition on matters of public concern in any substantial way. Suspension or no, the

15

Hospitals were perfectly free to express views about [the physician's] competence." (*Ibid*.)[9]

Applying this reasoning here, we find that taking actions on behalf of the PTO to fundraise or respond to a member's bullying complaints that are inconsistent with an officer's or director's fiduciary duty is not the same thing as making a public statement, casting a vote, or issuing a report on fundraising or member complaints. While defendants' allegedly improper actions may implicate public issues relating to public school governance and fundraising (*Geiser, supra*, 13 Cal.5th at p. 1252), defendants have not shown their actions "contribute[d] to or further[ed] the public conversation on an issue of public interest." (*FilmOn.com Inc. v. DoubleVerify Inc*. (2019) 7 Cal.5th 133, 154; *Bonni, supra*, 11 Cal.5th at p. 1022.) For one, there is no evidence their allegedly improper decisions were intended to or did enter the public sphere or contribute to the public discussion on a matter of public interest in a manner sufficient to warrant protection. Moreover, there is no connection between defendants' choice of fundraising methods or investigative procedures and their ability to speak on issues of public importance. Whether defendants decide to engage in unlawful fundraising or to coverup certain complaints, they remain free to publicly express their views on the importance of having sufficient funds to support the School and

_____

[9] The *Bonni* court had no cause to consider whether both the hospital-affiliated entities and the individual doctors could be held liable for their actions because the only issue under consideration for purposes of the first prong of the anti-SLAPP inquiry was whether the defendants collectively met their burden of showing each allegation supporting the plaintiff's claim of recovery is one that rests on protected activity. (*Bonni, supra*, 11 Cal.5th at p. 1009.) The same is true here—whether, under plaintiff's theories, any individual defendant can be held liable for breach of a fiduciary duty owed to the PTO is an issue that we do not resolve at this stage of the anti-SLAPP inquiry.

its students.  (Accord, *Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 909 [the school's decision to terminate a teacher's employment was not entitled to anti-SLAPP protection given that, regardless of "whether the School chose to terminate Bishop's employment, it was free to express its views on student safety and well-being"].)

Finally, there is no chilling effect on speech or petitioning in plaintiff's claims.  The threat of liability posed by her lawsuit encourages PTO officers and directors, indeed all officers and directors, to act competently and loyally.  This is a legitimate use, not misuse, of our legal system.  (*Park, supra*, 2 Cal.5th at p. 1067 ["Failing to distinguish between the challenged decisions and the speech that leads to them or thereafter expresses them 'would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power.' "].)

## III. *We need not assess the merit of plaintiff's claims.*

Individual defendants vehemently argue plaintiff's claims are all based on the PTO's decisions, for which they cannot be held personally liable.  Defendants also argue there are complete defenses to her claims, such as immunity under Government Code section 820.2.

However, whether plaintiff sufficiently alleges a basis for holding any individual defendant liable goes to the merits of her claims, which is an inquiry reserved for the second step of the anti-SLAPP analysis.  (*Wittenberg, supra*, 50 Cal.App.5th at p. 314.)  For purposes of our first step analysis, "we merely identify the acts supplying the elements of the challenged causes of action (*Park, supra*, 2 Cal.5th at p. 1063), and to that end, it is sufficient that [plaintiff] alleges she was harmed by [individual defendants'] breaches of [their fiduciary] obligations . . . ."  (*Wittenberg, supra*, 50 Cal.App.5th at p. 314; *City of Montebello, supra*, 1 Cal.5th at p. 427 [" 'If . . . a factual dispute

17

exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits' "].)

Thus, because plaintiff's cause of action for breach of fiduciary duty is based on claims arising from nonprotected activity, the burden does not shift to plaintiff to demonstrate her cause has merit. Accordingly, we affirm without reaching the second prong of the anti-SLAPP analysis. (*Medical Marijuana Inc. v. ProjectCBD.com* (2016) 6 Cal.App.5th 602, 620.)

## DISPOSITION

The trial court's order partially granting and partially denying defendants' anti-SLAPP motions is affirmed. Respondent is awarded her costs on appeal.


Jackson, P. J.


WE CONCUR:

Simons, J.
Burns, J.


A165574/*Foroughi v. Creighton*

18